**J. E. DAVANT and Kathryn Davant et al., Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**COMMISSIONER OF INTERNAL REVENUE**

**v.**

**J. E. DAVANT and Kathryn Davant et al.**

No. 22835.

United States Court of Appeals
Fifth Circuit.

Aug. 22, 1966.

Rehearing Denied Oct. 4, 1966.

Homer L. Bruce, William C. Griffith, Robert J. Piro, Houston, Tex., Baker, Botts, Shepherd & Coates, of counsel, Houston, Tex., for petitioners.

John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Mitchell Rogovin, Chief Counsel, Hu S. Vandervort, Atty., I.R.S., C. Moxley Featherston, Acting Asst. Atty. Gen., Fred R. Becker, Harry Baum, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before RIVES and BELL, Circuit Judges, and FULTON, District Judge.

RIVES, Circuit Judge:

The petitioners are persons who claim that the income from the sale of their stock in the South Texas Rice Warehouse Company should be taxed solely as a capital gain. The Tax Court found that a corporate reorganization had taken place and held that at least part of petitioners' income should be taxed as a dividend constituting ordinary income.[1] The government took a cross ap-

1. The opinion of the Tax Court is reported at 43 T.C. 540 (1965). A companion case, South Texas Rice Warehouse Co. v. Commissioner of Internal Revenue, 366 F.2d

peal contending that the Tax Court should have held that a greater portion of petitioners' income was ordinary income. Since we agree with the government, we affirm in part and reverse in part.

South Texas Rice Warehouse Co.[2] was incorporated under the laws of the State of Texas in 1936. The principal business of Warehouse consisted of drying, cleaning, and storing rice.[3] Warehouse's principal source of rice was land owned by a brother corporation, South Texas Water Co.[4]

Water was incorporated under the laws of the State of Texas in 1934. Water had two principal businesses. It owned land which it rented to a partnership, South Texas Rice Farms,[5] and it owned and operated an irrigation canal system used to irrigate the ricelands that it leased to Farms.

The principal business of Farms was re-leasing the land rented from Water to tenant farmers on a sharecrop arrangement. Generally, the tenant retained 50% of the rice produced and Farms received the other 50% as payment for the land provided.

The riceland which was leased by Farms from Water was irrigated by Water and the rice which Farms received from its tenants was put through Warehouse's dryer and stored by Warehouse. Water's lessees generally put their rice through Warehouse's dryer, and then stored their rice in Warehouse's facilities.

Warehouse and Water were each owned in equal proportions by four families.[6] The partners in Farms were the same persons who were the stockholders of Warehouse and Water and their respective interests were in substantially the same proportions as their stock ownership in the two corporations. The books and records of these three enterprises, while separately prepared, were all kept in the same office.

In 1960 a number of the stockholders consulted an attorney, Homer L. Bruce, Esq., about the possibility of transfer-

890 (1966), is presently pending before this panel. The Tax Court decided both cases in the same opinion and they were in effect argued together before this Court. Since they involve separate issues, we have elected to decide them separately.

2. Hereafter, Warehouse.

3. Although not relevant to this opinion, in June of 1957 Warehouse leased its op-

erating assets to a partnership involving members of the same families involved in this litigation. The tax consequences of that lease arrangement are the subject of the companion case, South Texas Rice Warehouse Co. v. Commissioner of Internal Revenue, 366 F.2d 890 (1966).

4. Hereafter, Water.

5. Hereafter, Farms.

6.

| "Owner of Stock | Percent of individual ownership | Percent owned by each family as a group |
|---|---|---|
| "L. D. Clements | 20 | |
| Thurman S. Clements | 2–½ | 25 |
| Betty Dickson Clements Fly and William S. Fly | 2–½ | |
| "John E. Davant | 7–6/7 | |
| Kathryn Davant Dodson | 7–1/7 | 25 |
| Mary Anne Davant Dunnam | 7–1/7 | |
| Hortense E. Davant | 2–6/7 | |
| "S. M. Clements | 15 | |
| Marienne Clements Clark | | 25 |
| and E. W. Clark | 10 | |
| "Raye W. Pegram | 8 | 25 |
| R. Q. Pegram, Jr. | 8 | |
| Joyce Pegram Jones | 3 | |
| Peggy Pegram Elliott | 3 | |
| Ray Beth Foster | 3 " | |

ring Warehouse's operating assets to Water for $700,000 and then liquidating Warehouse. This attorney had represented Warehouse, Water, and their stockholders for many years.

In the attorney's opinion, section 337[7] would allow the individuals to obtain capital gains treatment for any income they might receive in the transaction they contemplated. [8] However, Mr. Bruce advised against such a course of conduct. He told them that in a situation where such a sale and distribution was made when the stockholders of the two corporations were identical it was probable that the Internal Revenue Service would take the position that the stockholders had received a dividend taxable at ordinary rates and not a capital gain.

Mr. Bruce then suggested an alternate course of conduct which he believed would have the desired effect of having any gains taxed at the capital rather than the ordinary rate. The suggestion was that if the stockholders made a sale of their stock to a person not connected with them or their corporations at a fair price which would allow that person to make a reasonable profit, then that person could sell Warehouse's operating assets to Water and liquidate Warehouse without endangering the original stockholders' capital gains treatment.

Homer L. Bruce, Jr., a practicing attorney and the son of petitioners' attorney, was suggested by one of the stockholders as an appropriate person to buy their stock. Both Water and Warehouse had a corporate account with the Bank of the Southwest[9] and the Bank had for many years been represented by Mr. Bruce's law firm.

Mr. Bruce contacted A. M. Ball, a vice-president of the Bank. He told Mr. Ball that his son wished to buy Warehouse for $914,200 and wished to borrow the necessary funds from the Bank. The stock of Warehouse was to be the collateral for the $914,200 note of Bruce, Jr. It was understood that Water would then buy the assets of Warehouse for $700,000, and that this money plus part of the approximately $230,000 which Warehouse had in its bank account would be used, after Warehouse was liquidated, to repay the loan. This procedure allowed Bruce, Jr. to receive $15,583.30 for his part in the transaction, and allowed the Bank to receive what the parties designated as one day's interest on its $914,200 loan or $152.37.

Homer L. Bruce, Jr. was not present during his father's discussions with Mr. Ball nor did Bruce, Jr. participate in the discussions which determined that $914,200 should be the purchase price for the Warehouse stock and $700,000 the purchase price of Warehouse's operating assets to be paid by Water. No appraisals were made of the properties of Warehouse during 1960, although the Tax Court later found their fair market value to be at least the $700,000 paid for them by Water. The Bank loaned Bruce, Jr. $914,200, yet was never furnished a statement of his finances nor an appraisal or statement on Warehouse.

Mr. Ball, who approved the $914,200 loan, had no authority to approve loans in excess of $25,000 without prior approval of the Bank's discount committee. This particular transaction was not approved by the discount committee until after it was entirely a *fait accompli*.

On August 26, 1960 the stockholders of Warehouse, Mr. Ball, Mr. Bruce and his son met at the Bank. In accordance with a detailed instruction sheet,[10] the respective parties went through the mo-

7. All section references in this opinion are to the Internal Revenue Code of 1954 unless otherwise stated.

8. While the attorney spoke in terms of section 337, he, of course, meant sections 337 and 331.

9. Hereafter, Bank.

10. The instruction sheet is reproduced in the opinion of the Tax Court. 43 T.C. 540, at 553–555 (1965).

tions of making a loan, selling stock, electing new corporate officials, selling Warehouse's assets, liquidating Warehouse, and repaying the loan. Thanks to the careful prearrangement of all the details, the parties were able to act out their respective roles in approximately one hour.[11]

In terms of the actual physical carrying on of Warehouse's business, absolutely no disruption was occasioned by the paper transfer to Water. Every part of the business was carried on as before with the sole change being that it was necessary to keep one less set of books at the office. August 26 came during the busy rice drying season, but for those physically involved in carrying on Warehouse's business affairs, August 26, 1960 came and went like any other day— the dryers kept right on drying.

Petitioners take the position that the sale of their stock in Warehouse to Bruce, Jr. was a *bona fide* sale and that they properly reported their profits as the gain from the sale of a capital asset held over six months. The Commissioner argues that the transaction involved in this case is a corporate reorganization and that to the extent of the earnings and profits of both Warehouse and Water the gain reported here must be considered as a dividend taxable as ordinary income. The Tax Court held that the instant transaction constituted a corporate reorganization coming under section 368(a) (1) (D) of the Internal Revenue Code of 1954. However, the Tax Court also held that the gain was taxable as a dividend only to the extent of Warehouse's earnings and profits.[12]

We stand now at the threshold of our travel through the detailed and complex Code provisions that must govern our determination. Before we embark upon that journey it is well to restate the general principle that rules prescribed by Congress in the Code are often wholly reasonable and appropriate when taken in isolation, but that fact alone should not and must not prevent a court from harmonizing these apparently divergent elements of specific policy so that they may continue to cohabit the same body of general law which Congress has directed shall be viewed as a single plan.[13] As Mr. Justice Frankfurter so aptly stated, "There are no talismanic words that can avoid the process of judgment."[14]

In order to effectuate the intent of Congress the dividend, liquidation, redemption and reorganization sections of the Code must be examined and viewed as a functional whole. The basic framework by which Congress sought to tax corporate distributions is contained in sections 301(a), 301(c) and 316. Distributions of corporate funds to stockholders made with respect to their stockholdings must be included in their gross income to the extent that those distributions are made out of the corporation's earnings and profits. Such distributions are termed by the Code as dividends and are taxed as ordinary income.[15]

11. In addition to the instruction sheet, all of the necessary documents had been prepared in advance. These documents included the necessary papers for Warehouse's "sale" of its operating assets to Water.

12. The term "earnings and profits" is a term of art. Although it is not defined in the code, it has a well-settled meaning. For an explanation of the method of computing earnings and profits, see Bittker, Federal Income Taxation of Corporations and Shareholders (1959 ed.) sec. 5.04.

13. Cf. Bazley v. Commissioner of Internal Revenue, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782 (1947).

14. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, at 489 (1951).

15. Section 302 allows a redemption of corporate stock to receive capital gains treatment only if it "is not essentially equivalent to a dividend"; section 346 allows a partial liquidation of a corporation to receive capital gains treatment

All of the steps taken by taxpayer in this case with regard to the $200,000 worth of earnings and profits generated by Warehouse and the $700,000 worth of earnings and profits generated by Water were for the sole purpose of turning what otherwise would be a dividend taxed at the ordinary income rate into a gain made on the sale or exchange of a capital asset taxed at the much lower capital gains rate.

First, petitioners tell us that all they have done is sell their entire stock interest in Warehouse in a *bona fide* sale to an outside party. The sale of all of one's stock in a corporation, thus terminating taxpayer's proprietary interest in a corporation and its assets, is probably one of the most common forms of capital sales. But the Tax Court held, "The facts in this case show that Homer L. Bruce, Jr., was not a purchaser of the stock in any real sense but merely a conduit through which funds passed from Water Co. to Warehouse and from Warehouse to petitioners."[16] In this Court petitioners stress the fact that there was never a binding, written obligation on Water to buy Warehouse's assets or on Bruce, Jr. to sell them. Like the Tax Court, in view of all the circumstances, we can attach very little importance to the absence of any written obligations.[17]

For the purposes of the personal income tax provisions, courts have never been shackled to mere paper subterfuges. It is hard to imagine a transaction more devoid of substance than the purported "sale" to Bruce, Jr. In United States v. General Geophysical Co., 296 F.2d 86 (5 Cir. 1961), the government argued that this Court should always disregard the form of a transaction and look to the substance or reality of the transaction. Speaking through Judge Wisdom, this Court announced the following rule for judging when substance should predominate (296 F.2d at 87–89):

> "The solution of hard tax cases requires something more than the easy generalization that the substance rather than the form of a transaction is determinative of its tax effect, since in numerous situations the form by which a transaction is effected does influence or control its tax consequences.

> \*     \*     \*     \*     \*

> "Each case must be decided on its own merits by examining the form and substance of the transactions and *the purpose of the relevant tax provisions to determine whether recognition of the form of the transaction would defeat the statutory purpose.*" (Emphasis added.)

---

only if it is part of a complete liquidation or "is not essentially equivalent to a dividend"; sections 354, 355, 356 each contain a "boot" provision that deprives a distribution of capital gains treatment if it "has the effect of the distribution of a dividend"; section 351 also contains a "boot" provision; section 357 prevents a corporation from distributing a disguised dividend by assuming a stockholder's liability (for example, as part of a 351 transaction) where such an assumption would have a "purpose to avoid federal income tax"; section 306 prevents the use of preferred stock to convert what would be ordinary income into a capital gain by treating it "as a dividend" to the extent of the gain realized on its sale or exchange. Cf. section 304, which prevents a disguised dividend by having the stock of one corporation redeemed by its

brother corporation. In only one situation does the Code intend that a taxpayer should be allowed to receive the earnings and profits of his corporation without running the gauntlet of 301–316 or the equivalent boot provisions. That is where the taxpayer intends to stop employing the corporate form in administering that business, i. e., a bona fide complete liquidation under section 331 or its equivalent, where taxpayer sells all of his stock in a corporation and terminates his proprietary interest in those assets.

16. 43 T.C. 540, at 567 (1965).

17. Cf. Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945); United States v. General Geophysical Co., 296 F. 2d 86 (5 Cir. 1961).

Congress has provided in great detail what the tax consequences of a reorganization or partial or complete liquidation of a corporation should be. The tax consequences of this transaction must be judged by those standards because to allow the "sale" to Bruce, Jr. to divert our attention from the tax policies enacted by Congress would be to exalt form above all other criteria. He served no function other than to divert our attention and avoid tax. Stated another way, his presence served no legitimate nontax-avoidance business purpose. Cf. Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707 (1945); Campbell v. Wheeler, 342 F.2d 837 (5 Cir. 1965); United States v. Lynch, 192 F.2d 718 (9 Cir. 1951), cert. den., 343 U.S. 934, 72 S.Ct. 770, 96 L.Ed. 1342 (1952); Commissioner of Internal Revenue v. Transport Trading & Terminal Corp., 176 F.2d 570 (2 Cir. (1949), cert. den., 338 U.S. 955, 70 S.Ct. 493; 94 L.Ed. 1341 (1950); Fox v. Harrison, 145 F.2d 521 (7 Cir. 1944); Bard-Parker Co. v. Commissoner of Internal Revenue, 218 F.2d 52 (2 Cir. 1954), cert. den., 349 U.S. 906, 75 S.Ct. 582, 99 L. Ed. 1242 (1955).

In the *Court Holding* case, the Supreme Court, in reversing a decision by this Court, said (324 U.S. at 333-334, 65 S.Ct. at 708):

"The Tax Court concluded from these facts that, despite the declaration of a 'liquidating dividend' followed by the transfers of legal title, the corporation had not abandoned the sales negotiations; that these [liquidating dividends] were mere formalities designed 'to make the transaction appear to be other than what it was', in order to avoid tax liability.

\* \* \* \* \* \*

"The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. \* \* \* A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." [18]

The petitioners insist that, even if we recognize that Bruce, Jr. was merely their agent and impute his acts to them, they are entitled to capital gains treatment. They stress that they did no more than completely liquidate Warehouse corporation, which entitled them to a capital gain under section 331. The sale to Water of Warehouse's operating assets should not be treated as a taxable event, the petitioners argue, because of section 337. The "general rule" pronounced by section 337 is that if a corporation adopts a plan of complete liquidation and distributes all of its assets in complete liquidation within 12 months after the date the plan was adopted, no recognition of gain or loss shall be recognized on the sale of its property made during those 12 months.

18. In *Bazley* the Supreme Court adopted a rationale which would require that "a new arrangement intrinsically partake of the elements of ["a sale"] which underlie the Congressional exemption [of sales of stock from 301–316 treatment] and not merely give the appearance of it to accomplish a distribution of earnings. In the case of a corporation which has undistributed earnings, the creation [of a sham sale which transferred earnings] to stockholders in relation to their former holdings, so as to produce, for all practical purposes, the same result as a distribution of cash earnings of equivalent value, cannot obtain tax immunity [from sections 301–316] because cast in the form of a" sale. "The governing legal rule can hardly be stated more narrowly. To attempt to do so would only challenge astuteness in evading it." Bazley v. Commissioner of Internal Revenue (1947), 331 U.S. 737, at 742, 67 S.Ct. 1489, at 1491.

Section 331 provides that when a corporation is completely liquidated section 301 is inapplicable and the gain shall be treated as if derived from a sale or exchange of the stock. In short, the gain is to be treated as a capital gain. It would appear at first blush that petitioners have carefully fitted themselves directly within the statutory wording. But in the landmark case of Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935) the Supreme Court refused to give effect to a corporate transaction which complied precisely with the formal requirements for a nontaxable corporate reorganization, on the ground that the transaction had served no function other than that of a contrivance to bail out corporate earnings at capital gains tax rates.[19] That is precisely the charge made here. Let us examine what legitimate purposes might be served by the transactions here under consideration. Three distinct and separate things occurred.

First, $700,000 in earnings and profits possessed by Water were passed through Warehouse to petitioners. Second, $200,000 in earnings and profits from Warehouse were distributed to petitioners. Third, the operating assets of Warehouse were combined with Water and were from that point on owned and controlled through Water. Only one business nontax-avoidance purpose can be found to support any of these events: petitioners wished to eliminate one of the corporate shells and thereafter control all of the properties under one roof. This motive legitimately explains why petitioners transferred the operating assets of Warehouse to Water. But it does not explain either of the first two steps. Under the reorganization provisions of the Code petitioners could have trans-

ferred all of Warehouse's assets, including its earnings and profits, to Water without paying any tax. Thus the payment of $200,000 from Warehouse to petitioners cannot be explained as necessary in order to place both businesses under the same roof. Likewise, there was no need for petitioners to cast the transfer of Warehouse's operating assets in the form of a sale. The businesses could be combined under one roof without the $700,000 from Water ever coming over to Warehouse. It is apparent that no functional relationship exists between either the $200,000 coming to petitioners from Warehouse or the $700,000 coming to petitioners from Water and the transfer of Warehouse's assets to Water. Petitioners make no attempt to provide a nontax-avoidance purpose for their actions, but instead argue that these events cannot be a reorganization because they do not come under the literal language of the reorganization provisions. They then reason they must be a complete liquidation since they do come under the literal language of the complete liquidation provisions. As Justice Frankfurter once put it, "The syllogism is perfect. But this is a bit of verbal logic from which the meaning of things has evaporated."[20]

Clearly, this liquidation cannot come within the intention of Congress in enacting the complete liquidation provisions. Those provisions contemplate that operating assets will no longer be used by the stockholders to carry on the business as a corporation. It has long been recognized that taxpayers cannot liquidate a corporation with the intention of immediately reincorporating it in order to hold back liquid assets and cash for the purpose of getting capital gains treatment or to

19. In Bazley v. Commissioner of Internal Revenue, 331 U.S. 737, 67 S.Ct. 1489 (1947), the Supreme Court again refused to give effect to a corporate transaction which complied precisely with the formal requirements for a nontaxable corporate reorganization, on the ground that the transaction was an attempt to bail out corporate earnings.

20. Phelps Dodge Corp. v. NLRB, 313 U.S. 177 at 191, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

obtain a stepped-up basis for the operating assets or to wipe out old earnings and profits or other tax attributes. Such a liquidation reincorporation transaction does not qualify for section 331 treatment. In Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775 (1942), the Supreme Court affirmed an appeal from this Circuit in which this Court had held that a series of events must be construed as a single transaction coming within the reorganization provisions, even though they did not meet its literal language.[21] The Supreme Court said (315 U.S. at 184–185, 62 S.Ct. at 544):

> "[T]he separate steps were integrated parts of a single scheme. Transitory phases of an arrangement frequently are disregarded under these sections of the revenue acts [i. e., the liquidation and reorganization provisions] where they add nothing of substance to the completed affair. [Citations omitted.] Here they were no more than intermediate procedural devices utilized to enable the new corporation to acquire all the assets of the old one pursuant to a single reorganization plan."

See Bard-Parker Co. v. Commissioner of Internal Revenue, 218 F.2d 52 (2 Cir. 1954), cert. den., 349 U.S. 906, 75 S.Ct. 582 (1955); Survaunt v. Commissioner of Internal Revenue, 162 F.2d 753 (8 Cir. 1947); Lewis v. Commissioner of Internal Revenue, 176 F.2d 646 (1 Cir. 1949). Applying the concept that we must look at petitioners' plan as a whole to the extent that the parts are functionally related, and not at its constituent parts individually, for the purpose of determining whether section 331 applies, we conclude that section 331 does not apply in this case.

Petitioners never intended to give up the corporate form of doing business. At all times relevant their intention was to transfer Warehouse's operating assets to Water. Water and Warehouse were owned by identical shareholders with identical distribution of shares. At no time did the petitioners' interest in the operating assets change. Most of the reported cases involve situations where the stockholders create a new corporate shell to receive the assets, but we see no difference between a liquidation followed by a transfer to a new corporate shell and a liquidation followed by a transfer to an already existing corporate shell.[22]

Since this interchange of events cannot be viewed as a complete liquidation, we must now decide, for the purposes of the federal tax code, what it is. In the Tax Court the Government contended that this was a 368(a) (1) (D) or (F) reorganization.

A section 368(a) (1) (F) reorganization is defined as "a mere change in identity, form, or place of organization, however effected." Since the Tax Court held that this transaction was a (D) reorganization, it apparently believed that it was unnecessary to decide the (F) question. In the past, type (F) reorganizations have overlapped with type (A), (C) and (D) reorganizations. For this reason this provision has received almost no administrative or judicial attention. It is true that a substantial shift in the proprietary interest in a corporation accompanying a reorganization can hardly be characterized as a mere change in identity or form. Helvering v. Southwest Consolidated Corp., 315 U.S. 194, 62 S.Ct. 546, 86 L. Ed. 789 (1942).

---

21. Taxpayer had sought a recognition of each step in a preconceived plan by which the bankrupt corporation first transferred its assets to its creditors and they then reincorporated them.

22. This liquidation does not "intrinsically partake of the elements" "which underlie the congressional exemption" from ordinary gains tax treatment in section 331. Bazley v. Commissioner of Internal Revenue (1947), 331 U.S. 737, at 742, 67 S. Ct. 1489. Here, the transfer of all of the operating assets to Water within the same hour as the liquidation meant that petitioners continued to carry on their business using the corporate form just as before.

The term "mere change in identity [or] form" obviously refers to a situation which represents a mere change in *form* as opposed to a change in substance. Whatever the outer limits of section 368(a) (1) (F), it can clearly be applied where the corporate enterprise continues uninterrupted, except for a distribution of some liquid assets or cash. Under such circumstances, there is a change of corporate vehicles but not a change in substance. If Water had no assets of its own prior to the transfer of Warehouse's operating assets to it, could we say that Water was any more than the alter ego of Warehouse? The answer is no. The fact that Water already had other assets that were vertically integrated with Warehouse's assets does not change the fact that Water was Warehouse's alter ego. Viewed in this way, it can make no practical difference whether the operating assets were held by Water or Warehouse, and a shift between them is a mere change in identity or form. At least where there is a complete identity of shareholders and their proprietary interests, as here, we hold that the type of transaction involved is a type (F) reorganization.

In the alternative, we also hold that the Tax Court correctly held that these events constituted a 368 (a) (1) (D) reorganization. The (D) question is more complex than the (F) question. Section 368(a) (1) (D) defines a corporate reorganization as:

"[1] a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; [2] but only if, in pursuance of the plan, *stock or securities* of the corporation to which the assets are transferred *are distributed in a transaction which qualifies under section 354, 355, or 356 \* \* \*."* (Emphasis added.)

In this case, it is clear that the petitioners have satisfied part one of the type (D) definition. Warehouse is a "corporation" and it transferred "a part of its assets to another corporation," Water. Since both corporations were owned identically by petitioners the "control" requisite was fulfilled.

Petitioners argue that the provision cannot apply to them because in part two Congress specifically required that "stock or securities" of the transferee corporation be passed to petitioners. They, of course, point out that they received no new stock in Water as a part of their transaction. We cannot agree that this statutory requirement must be taken literally, especially where it would prevent the effectuation of the tax policies of Congress.

The (D) reorganization provisions have never been confined to a strictly literal application. It will be noted that section 368(a) (1) (D) requires that the transferor be "a corporation." But it has been consistently held that a proper interpretation and application does not prevent from coming under the aegis of 368(a) (1) (D) a transfer made by "persons" who have received assets from a corporation with the intention of transferring them to another corporation. Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540 (1942); Bard-Parker Co. v. Commissioner of Internal Revenue, 218 F.2d 52 (2 Cir. 1954).

Nor in ascertaining the intention of Congress should we ignore the function intended for part two of the type (D) definition. Section 368 is not an operative provision but merely defines what Congress meant by the term reorganization. The operative provisions for a 368 (a) (1) (D) reorganization are those which Congress has cited, sections 354, 355 and 356. These latter three sections

determine what will be the tax consequences of a type (D) reorganization.

■ Congress realized that splitting up a corporation or merging two corporations were not events that normally justified the imposition of a tax on stockholders. If a stockholder merely traded one stock certificate for another he would have no cash or liquid assets with which to pay a tax. To Congress these reorganizations were essentially a change in form.[23] As a general rule, however, an "exchange" of stock is taxed.

■ In order to give taxpayers relief from this general rule of taxation where no liquid assets or cash are realized, Congress enacted the reorganization provisions. But inherent in the reorganization provisions were two evils which Congress also attempted to avoid.

The first was that a taxpayer might wish to disguise *a sale* of his proprietary interest as a tax free reorganization and by that means avoid all tax. This type of evasion has been disapproved. Turnbow v. Commissioner of Internal Revenue (1961), 368 U.S. 337, at 343, 82 S.Ct. 353, 357, 7 L.Ed.2d 326 where the Supreme Court said:

> "To indulge such an assumption [as the taxpayer made] would actually be to permit the negation of Congress'

carefully composed definition and use of 'reorganization' in those subsections, and to permit nonrecognition of gains *on what are, in reality, only sales*, the full gain from which is immediately recognized and taxed under the general rule * * *." (Emphasis added.)

Cf. Le Tulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355 (1940).

The second evil, the converse of the first, is where a taxpayer attempts to disguise a reorganization as a sale in order to obtain the more favorable tax benefits that a sale sometimes provides. See Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540 (1942); Bard-Parker Co. v. Commissioner of Internal Revenue, 218 F.2d 52 (2 Cir. 1954), cert. den., 349 U.S. 906, 72 S.Ct. 582 (1955). Of course, this is the same as where a corporation is liquidated and its operating assets are then conveyed to a new corporation in a section 351 transaction.[24] In the reorganization provisions themselves, Congress has attempted to provide for taxing the syphoning off of liquid assets in the course of a reorganization.

In sections 354, 355 and 356 Congress has provided for the tax consequences of holding out cash or liquid assets in a

---

23. See Bazley v. Commissioner of Internal Revenue (1947), 331 U.S. 737, at 740–741, 67 S.Ct. 1489, at 1491. "As to these, Congress has said that they are not to be deemed significant occasions for determining taxable gain. These considerations underlie [section 368] and they should dominate the scope to be given to the various sections, all of which converge toward a common purpose."

24. There are actually three common garden varieties of this disguised reorganization device. 1. The original corporation can transfer property to a new corporation, receiving back the new corporation's stock. This stock along with other assets is then distributed to the original corporation's stockholders. See, for example, Becher v. Commissioner of Internal Revenue, 221 F.2d 252 (2 Cir. 1955); Lewis v. Commissioner of Internal Revenue, 176 F.2d 646 (1 Cir. 1949). 2. The stock-

holders form a new corporation to which the old corporation then sells its property, followed by the liquidation of the old corporation. See, for example, Liddon v. Commissioner of Internal Revenue, 230 F.2d 304 (6 Cir. 1956), cert. den., 352 U.S. 824, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956); Pebble Springs Distilling Co., 23 T.C. 196 (1954), aff'd, Pebble Springs Distilling Co. v. Commissioner of Internal Revenue, 231 F.2d 288 (7 Cir. 1956), cert. den., 352 U.S. 836, 77 S.Ct. 56, 1 L.Ed.2d 55 (1956). 3. The old corporation can first be liquidated, followed by the stockholders transferring the assets to a new corporation. See, for example, Bard-Parker Co. v. Commissioner of Internal Revenue, 218 F.2d 52 (2 Cir. 1954), cert. den., 349 U.S. 906, 72 S.Ct. 582 (1955); Survant v. Commissioner of Internal Revenue, 162 F.2d 753 (8 Cir. 1947).

368(a) (1) (D) reorganization. Congress has drawn these provisions to cover the normal procedure for a taxpayer legitimately wishing to take advantage of the taxfree reorganization provisions. It is only natural then that Congress would speak in terms of stock transferred in the course of a reorganization. The exchange of stock in the course of a legitimate reorganization was the specific case most likely to occur to the mind and the most logical way to draw the statute. The fact that Congress drew the statute to fit the most common form of the problem does not mean that it had any intention of allowing the two evils most inherent in a reorganization scheme to persist. Cf. Johnson v. United States, 163 F. 30, 32 (1 Cir. 1908) (Opinion by Mr. Justice Holmes).

Moreover, since the operative sections were cast in terms of stock transfers, it was only normal that in referring to those sections in 368(a) (1) (D) that Congress referred to "stock or securities" "distributed in a transaction which qualifies under section 354, 355, or 356." Congress thus did not intend to place any special emphasis on the idea that stock *must* be transferred, rather Congress only intended to use this convenient terminology in referring to the operating provisions of the Code.[25]

Petitioners' major argument against the application of 368(a) (1) (D) and 354, 356 thus rests on the weak foundation that Congress required stock to pass before a reorganization under section 368(a) (1) (D) could be found. Section 354 when coupled with section 356 requires that cash or liquid assets received by stockholders as part of a reorganization be taxed as a dividend. In Commissioner of Internal Revenue v. Morgan, 288 F.2d 676 (3 Cir. 1966), the taxpayer also claimed that Congress'

clear intent could be avoided by a transaction where no new stock passed.

In *Morgan,* taxpayer was the sole stockholder of two corporations. They, like the corporations here involved, had been in operation for many years. In overruling the taxpayer's objections, the Third Circuit said (288 F.2d at 680):

"If the transferor's assets had been transferred to a newly formed corporation in exchange for stock, there is no question that the boot [cash or liquid assets received] would have been taxable as dividend income. That an existing corporation in which the taxpayer was the sole shareholder was used instead of a newly formed one cannot alter the true nature of the transaction. Here, the issuance of new stock would have been a meaningless gesture since the stock the taxpayer already held represented the total value of all the assets except for the boot."

Applying the rationale of *Morgan* to the instant case requires the same result. The same stockholders owned all of the stock of both Water and Warehouse. Before the transaction the operating assets' value of Warehouse was reflected in the value of its stock. Similarly, the operating assets' value of Water was reflected in the value of its stock. The stockholders had both stocks and their combined certificates reflected the value of their combined operating assets. After the transaction petitioners only had the stock of Water, but it then reflected the value of the combined operating assets of Water and Warehouse. Therefore, the appreciation of the value of Water's stock certificates caused by the transfer of Warehouse's operating assets to Water was the equivalent of issuing $700,000 worth of new or additional stock to Water's stockholders.[26] *"Here,*

---

25. In fact, a study of the complete legislative history of section 368(a) (1) (D) clearly shows that when Congress added the second section in 1954, it was attempting to close old loopholes, not create new ones.

26. It follows logically from what we have said that the basis formerly belonging to petitioners' Warehouse stock must now be added to the basis of their Water stock. Had the assets of Warehouse been transferred to Water for Water's stock, as

*the issuance of new stock would have been a meaningless gesture * * *."* Commissioner of Internal Revenue v. Morgan, supra; accord, Liddon v. Commissioner of Internal Revenue 230 F.2d 304 (6 Cir. 1956), cert. den., 352 U.S. 824, 77 S.Ct. 34 (1956). To require the actual transfer of stock certificates where such a transfer would be a meaningless gesture would be to make the reorganization provisions optional with the taxpayer, a result which Congress clearly did not intend.

■ Conversely, a purchase of stock has been treated as a purchase of assets where it is necessary to effectuate the intent of the Code. Take, for example, the situation where a taxpayer purchases all of the stock in a corporation solely so he can liquidate the corporation and use the assets. Application of section 331 would distort the reality of what has taken place. In such situations the courts have treated the purchase of stock as if it were a purchase of assets. Snively v. Commissioner of Internal Revenue, 19 T.C. 850 (1953), aff'd, 219 F.2d 266 (5 Cir. 1955); see also Western Wine &

Liquor Co. v. Commissioner of Internal Revenue, 18 T.C. 1090 (1952); Cullen v. Commissioner of Internal Revenue, 14 T.C. 368 (1950). Neither the appreciation or depreciation of the assets between the time the stock was purchased and the corporation liquidated will be recognized by the taxpayer. Therefore, we see that the treatment of stock as assets, or assets as stock, has always been utilized by the courts in harmonizing the statutory language with the single rational plane of taxation envisioned by Congress.[27]

■ We come now to the last leg of our journey; the question of whether the earnings and profits of Warehouse and Water should be combined in determining whether the full $900,000 cash received by petitioners should be treated as a dividend. We hold that the $700,000 coming indirectly from Water and the $200,000 coming from Warehouse must be tested against their combined earnings and profits. Whether we reach this result by means of calling this transaction a type (D) or type (F) reorganization, or a dividend declared simul-

---

they would have been if this transaction had actually been cast as a reorganization, the Water stock would have received the basis of petitioners' Warehouse stock when Warehouse was liquidated. See Treasury Reg. 1.358–1. A different result should not be obtained just because petitioners received no new stock but merely allowed their existing stock to appreciate in value. Cf. Treasury Reg. 1.302–2(c).

27. Petitioners have cited us to a number of cases where the courts have construed the reorganization provisions with strict literalness without regard to the fact that it defeated the purpose of the tax statute. Each time, Congress acted to close the judicially created loophole. From this interchange of events, petitioner asks us to draw the conclusion that the courts should always permit tax evasion when a literal application of the Code will minimize tax consequences regardless of the true economic realities. We draw just the opposite conclusion. Having been consistently rebuked by Congress in this area whenever we departed from the inherent purpose of the statutory scheme, we should avoid making the same mistakes

and, instead, utilize all our efforts to apply the Code as Congress intended. The problem created for Congress if the courts adopt any other approach to the reorganization provisions is made painfully apparent by this litigation. The statute must be narrow enough to prevent sales being made to look like reorganizations and broad enough to prevent reorganizations being made to look like sales. Had the courts adhered to obvious legislative intent and not felt restricted to a literal and rather restrained interpretation, there would have been no necessity for Congress to enact the detailed, almost impossible to follow, complicated reorganization provisions which now confront us. The rules could be simple: 1) those who genuinely participate in reorganizations would get the tax deferment Congress intended; 2) those who sell property or withdraw earnings would be taxed as Congress intended. The considerations underlying the reorganization provisions were not cast in terms of form but of substance. Courts in performing their judicial duty must take notice of this fact. See Bazley v. Commissioner of Internal Revenue, 331 U.S. 737, 67 S.Ct. 1489 (1947).

taneously with a reorganization, makes no difference. But, in order to avoid future confusion, we think it appropriate to explain our three separate rationales.

Taking in inverse order the separate methods of reaching our conclusion, we hold that the $700,000 petitioners received from Water and the $200,000 petitioners received from Warehouse were dividends under section 301, declared incident to a reorganization. See Bazley v. Commissioner of Internal Revenue, 331 U.S. 737, 67 S.Ct. 1489 (1947). In Bazley, a corporation attempted to transfer liquid assets to a taxpayer, claiming they were a part of a reorganization under what is now section 368(a) (1) (E) which provides for recapitalizations. The Supreme Court characterized the modification of the capital account which constituted the reorganization-recapitalization as "unrelated" to the transfer of the liquid assets which the Court held to be a dividend under what is now section 301.

The same characterization is apt in the instant case. Three separate events took place. The distribution of $700,000 which had been generated incident to the earnings and profits of Water has no rational connection with the reorganization involving Warehouse. It was not necessary to pass this money through Warehouse and Bruce, Jr. in order to accomplish the reorganization. Everything that we said about Bruce, Jr. may be said about Warehouse in regard to the $700,000. Warehouse, under the circumstances of this case, was in no real sense a seller of assets to Water but merely a conduit through which funds passed from Water to Water's stockholders. Since both Warehouse and Water were owned in exactly the same way by the same stockholders, after the funds ended their circuitous route through Warehouse and Bruce, Jr., we see that they were a distribution "with respect to its stock" as required by section 301. The effect was precisely the same as if Water had passed them up directly to its stockholders.

The fact that we held that the transfer of Warehouse's assets and the "sale"-liquidation of Warehouse's stock should be viewed as an integrated transaction does not mean that we are being inconsistent when we separate the distribution of Water's cash to its stockholders. We are merely recognizing that two distinct and functionally unrelated types of transactions were carried on simultaneously—one was a dividend and the other a reorganization. The Code does the same thing in section 356. It recognizes that a series of complicated events may occur which are legitimately a reorganization. These are not taxed. Simultaneously, a taxpayer may receive boot having the effect of a dividend. The dividend's only relation to the reorganization is that it occurred at the same time. The boot where appropriate is taxed as a dividend.

Water, if it chose, could have declared the $700,000 as a dividend before the reorganization with Warehouse ever took place. Or Water could have waited and a week, a month or a year later distributed this dividend. Had it chosen any of these courses, the reorganization involving Warehouse would not have been affected in the slightest. We, therefore, hold that the $700,000 received by petitioners from Water is a distribution governed by sections 301(a), 301(c) and 316. The same reasoning demonstrates that $200,000 coming from Warehouse was a dividend since it was functionally unrelated to the reorganization.[28] We, therefore, hold that the

---

**28.** Since Warehouse ceased to exist after the reorganization, it obviously could not have declared a $200,000 dividend after the reorganization. But after the reorganization, if the $200,000 had not been declared as a dividend before, it would have passed to Water along with all of Warehouse's statutorily attributable earnings and profits under section 381. Section 381 was enacted in 1954 to provide a comprehensive set of rules for the preservation of merging corporations' tax attributes, such as earnings and profits. This preservation was to be "based upon economic realities rather than upon such artificialities as the legal form of the reorgan-

$200,000 received by petitioner from Warehouse is a distribution governed by sections 301(a), 301(c) and 316.

██ Even if the $700,000 received from Water were not a dividend under sections 301(c) and 316, it would be boot under section 356. Section 356 tells us that, when a taxpayer as part of a reorganization receives not only stock but liquid assets or cash to boot, that boot shall be taxed as a dividend to the extent of the earnings and profits of the distributing corporation. The Tax Court believed the words "of the corporation" referred only to Warehouse and, therefore, held that the $900,000 received should be taxed only to the extent of Warehouse's earnings and profits since it was the only distributing corporation.

We cannot agree with this narrow construction in a case where there is complete identity of ownership of both corporations. Water and Warehouse were but different pockets in the same pair of trousers worn by petitioners. It would be illogical to say that $700,000 would be used to measure how much of the $900,000 distribution had the effect of a dividend if Water were merged into Warehouse and only $200,000 should be used to measure how much of the $900,-000 distribution had the effect of a dividend just because Warehouse was merged into Water.

Where there is complete identity of stockholders, the use of the earnings and profits of both corporations is the only logical way to test which distributions have the effect of a dividend. Before the reorganization the petitioners had two pockets with $900,000 in cash divided between them. After the reorganization the petitioners had removed all that cash from both pockets, and it should not matter that before removing it completely they took it out of the right pocket and put it in the left.

The statute in speaking of "the corporation" means the corporation controlled by the stockholders receiving the distribution. Where there is complete identity, as here, the stockholders control both corporations and it is virtually impossible to tell which corporation is in reality "the corporation" distributing the cash. We have two corporations each one of which is distributing cash; therefore, we must look at the earnings and profits of both corporations to see if the distribution is essentially equivalent to a dividend or has the effect of a dividend.

The Tax Court was correct that section 356(a) (2) in using the term "the corporation" meant the distributing corporation. However, the Tax Court erred when it failed to see that in this case there were two distributing corporations, each of which was a party to this reorganization. As we said in connection with our holding for purposes of applying section 301, Warehouse was a conduit for Water's distribution of $700,000 and thus, in determining which corporation was the distributing corporation for purposes of 356(a) (2), we must look through Warehouse and reach Water. Cf. Commissioner of Internal Revenue v. Owens, 69 F.2d 597 (5 Cir. 1934); also compare United States v. Joliet & Chicago R. Co., 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658 (1942).

It would not benefit petitioners even if they prevailed on their argument that "the corporation" means only the last distributing corporation. Section 482 permits the Commissioner to "allocate" such tax attributes as are here involved between two corporations "owned" "by the same interests" if "such" "allocation is necessary in order to prevent evasion of taxes." No clearer evasion of taxes can be imagined than converting what would be a dividend taxable at ordinary rates into a capital gain by merely passing it through another corporate shell. We hold that under section 356 and/or

---

ization." S.Rep. No. 1622, 83 Cong., 2d sess., 52, U.S. Code Cong. & Admin.News 1954, p. 4621. Therefore, if Water had distributed the $200,000 received from

Warehouse after the reorganization it would have been a dividend under 301(a), 301(c), 316.

section 482 the effect of distributing the $700,000 and the $200,000 must be tested by the combined earnings and profits of both Warehouse and Water.

We need pause for only a moment at the door of 368(a) (1) (F). The effect of a type (F) reorganization is largely unchartered ground; we hold that the funds passed to stockholders in a type (F) reorganization must be tested by the standards laid down under sections 301 and 316. As we showed earlier, that would result in the $900,000 being tested by the earnings and profits of both Warehouse and Water.

Since the Tax Court did not find what Water's earnings and profits were at the time relevant for determining the effect of its distribution of $700,-000, we must remand this case. The opinion of the Tax Court is affirmed in part and reversed in part, and the case is remanded for further proceedings not inconsistent with this opinion.

Affirmed in part and reversed in part.

See also 5 Cir., 366 F.2d 874.