**SPINOZA, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 73–H–151.**

United States District Court,
S. D. Texas,
Houston Division.

May 6, 1974.

---

[11]. American Federation of Labor v. N.L.R.B., *supra*, at 411, 412, 60 S.Ct., at 305.

**440**

George A. Hrdlicka, Chamberlain, Hrdlicka, White & Waters, Houston, Tex., for plaintiff.

Howard A. Weinberger, Atty., Tax Div., Dept. of Justice, Dallas, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, District Judge.*

This cause came on for trial before the Court without a jury. The Court, having considered the record and being fully advised in the premises, enters the following findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiff, Spinoza, Inc., is a corporation formed under the laws of the State of Delaware with its principal place of business located in Harris County, Texas. Another corporation of the same name formed under the laws of the State of Texas also had its principal place of business in Harris County, Texas. For purposes of convenience hereinafter, these two corporations will be referred to as Spinoza of Delaware and Spinoza of Texas, respectively.

2. Spinoza of Texas was formed on July 27, 1965, and adopted a fiscal year of accounting ending June 30. In accordance with this election, it timely filed its federal income tax returns for the fiscal periods ending June 30, 1966, June 30, 1967, June 30, 1968, and June 30, 1969. It also filed a federal income tax return for the short period between July 1, 1969, and September 30, 1969. Spinoza of Delaware seeks refund of taxes paid on account of Spinoza of Texas' fiscal year ended June 30, 1969, and the short period ended September 30, 1969, in the total amount of $132,412.02 (principal—$117.435.57; assessed interest—$14,976.45).

3. The taxes and assessed interest referred to in paragraph 2 arose, in part, by virtue of a determination by the Internal Revenue Service with respect to Spinoza of Texas' method of accounting for long-term contracts. Spinoza of Delaware does not now contest the correctness of this determination. It only contests that it has a right to carry back certain losses incurred by it after September 30, 1969, to the immediate two preceding taxable periods of Spinoza of Texas under Section 381 of the Internal Revenue Code of 1954. Whether Spinoza of Delaware had the right to carry back these losses to offset income of

* Sitting by designation pursuant to 29 U.S.C. § 292 (1970).

Spinoza of Texas is the sole issue currently presented to the Court.

4. Within two years following the tax payments referred to in paragraph 2 above, Spinoza of Delaware filed claims for refund of the taxes covering the fiscal years of Spinoza of Texas ended June 30, 1969, and the short period ended September 30, 1969, which were disallowed by the Government on January 16, 1973. Thereafter, Spinoza of Delaware commenced this lawsuit.

5. Spinoza of Delaware claims that it is entitled to carry back its losses incurred after September 30, 1969, to the previous two taxable periods of Spinoza of Texas because a certain transaction to be referred to hereinafter was in effect a reorganization pursuant to the provisions of Section 368(a)(1)(F)—"a mere change in identity, form, or place of organization, however effected." If Spinoza of Delaware is correct in its contention, then Section 381(b) does not forbid a loss carryback and Spinoza of Delaware must be allowed the tax treatment it seeks.

6. The Government claims, however, that the transaction in question was a reorganization defined under Section 368(a)(1)—

(A) a statutory merger or consolidation;

(B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock * * * of stock of another corporation * * *

If the Government is correct in its contention, then Section 381(b) forbids the carryback of post-reorganization losses to pre-reorganization profits and the Government must prevail.

Thus, the issue presented directly to this Court is whether the transaction to be described in the next succeeding paragraph constituted a so-called "F" reorganization as Spinoza of Delaware contends or a so-called "B–A" reorganization as the Government contends.

7. Prior to September 30, 1969, Spinoza of Texas was owned by certain individuals headed by Charles M. Miller.

Mr. Miller was the president and chief executive officer of Spinoza of Texas and owned directly, or through his family, more than one-half of its outstanding stock. On September 30, 1969, Spinoza of Texas, Spinoza of Delaware, and NHA, Inc., entered into a "plan and agreement of merger", which effectuated the following transaction:

Spinoza of Delaware, which had previously been formed in anticipation of the transaction, transferred all 1,000 of its outstanding shares of stock to NHA, Inc., in exchange for 395,000 of NHA's 1,047,800 shares of outstanding stock. Then Spinoza of Delaware transferred all 395,000 shares of NHA's stock to the shareholders of Spinoza of Texas in exchange for all of Spinoza of Texas' outstanding 28,900 shares of stock. Finally, Spinoza of Delaware which held all of Spinoza of Texas' outstanding stock merged Spinoza of Texas into Spinoza of Delaware. Following this, by operation of state law, Spinoza of Texas ceased its corporate existence.

After the transfers of stock, Spinoza of Delaware which owned all the corporate assets theretofore owned by Spinoza of Texas was a wholly owned subsidiary of NHA. The former stockholders of Spinoza of Texas now held, between them, 395,000 shares or 37.7% of NHA's stock. Spinoza of Texas' shareholders assumed four of the 11 seats of NHA's board of directors; certain of the Spinoza of Texas' officers entered into a three-year employment contract with Spinoza of Delaware; and those same persons entered into covenants not to compete as set out in the plan and agreement of merger.

8. Following the transaction, Mr. Miller stayed on as president and chief executive officer of Spinoza of Delaware. However, a major change occurred in the conduct of the corporate business. Prior to the transaction, Mr. Miller had started out in the engineering business and then went into construction

as his capital grew greater. It was always his intention to remain in both the engineering and construction business. Following the transaction, however, NHA took away Spinoza's engineering division and set it up as a separate division. Moreover, it added too much overhead to the engineering business and, after approximately two months, was forced to withdraw entirely from the engineering business. In addition to this major change in the conduct of the corporate business, Spinoza of Delaware, following the transaction, was forced to report to NHA on a periodic basis, to submit budget information to NHA's financial people and to conform to the requirements of the Securities & Exchange Commission, as well as other applicable rules and regulations for public corporations.

9. Sometime following the execution of the plan and agreement of merger, acrimony arose between the four remaining members of the Miller group and those persons in control of NHA. This acrimony resulted first in the resignation of Miller and three of his former associates from the board of directors of NHA, Inc. Then, Miller made an offer to reacquire Spinoza of Delaware from NHA which was subject to a letter of agreement but never consummated. Finally, Miller joined with minority NHA shareholders in California who had acquired their NHA stock in an acquisition shortly after the Spinoza transaction to oust the old NHA management. At the present time, Spinoza of Delaware is one of five corporate divisions of NHA, being third in size as measured by sales.

10. Following execution of the plan and agreement of merger, Spinoza of Texas terminated its taxable period on September 30, 1969. Under Rules and Regulations in effect regarding such taxable years, this taxable treatment was proper if the transaction was a "B–A" reorganization but was an improper and impermissible treatment if the plan and agreement of merger constituted an "F" reorganization. This is so because in an "F" reorganization, a corporation continues its taxable year and methods of accounting on an uninterrupted basis while under an "A" reorganization it must terminate its taxable year and start anew. Spinoza of Delaware then attempted to conform its taxable year to that of the parent corporation, NHA, Inc., which was on a calendar year basis. That is, Spinoza of Delaware joined in the consolidated return of NHA, Inc., for the calendar year ending December 31, 1969. It did this without requesting the permission of the Secretary of the Treasury or his delegate to change accounting periods. Under Rules and Regulations then in effect, Spinoza of Delaware could not change its fiscal year to accord with that of the parent corporation, NHA, Inc., without the permission of the Secretary of the Treasury or his delegate if the transaction constituted an "F" reorganization. On the other hand, if the plan and agreement of merger constituted a "B–A" reorganization, then, Spinoza of Delaware would have been entitled to start its taxable period afresh and choose whatever accounting period it wished in order to coincide with NHA's accounting period without the permission of the Secretary of the Treasury or his delegate.

11. Spinoza of Texas, on the date that the plan and agreement became effective, closed its books and accounts as well as its taxable year. It did this in accordance with the requirement of NHA's accountants, Peat Marwick Mitchell & Co., Houston, Texas. Peat Marwick also required Spinoza of Texas to adopt the percentage of completion method of accounting for long-term contracts on the books of Spinoza of Texas as of the transaction date. This method of accounting for contracts in process is necessary when a corporation undergoes a "B–A" reorganization because use of the completed contract method of accounting for long-term contracts would materially distort the recognition of income. On the other hand, if the reorganization constituted an "F" reorganization then it would not be necessary to

utilize the percentage of completion method of accounting for long-term contracts because no material distortion of income would be involved in a corporation merely changing its corporate identity, place of incorporation, or the like.

### Conclusions of Law

12. This Court has jurisdiction of the subject matter of this suit pursuant to 28 U.S.C. § 1346 and of the parties; this case was properly brought in this Court.

13. A corporation may, subject to certain limitations not here in issue, utilize its net operating losses to offset its own previously earned taxable income. Internal Revenue Code of 1954, Section 172 (26 U.S.C.). However, when a corporation seeks to utilize its net operating losses to offset the taxable income of a different predecessor corporation, the Regulations to Section 1502 and the limitations of Section 381 must be examined to determine whether such carryback is allowable. Treasury Regulations on Income Tax (1954 Code), Section 1.-1502–79 (26 C.F.R.), provide in general that successor corporations may carry back net operating losses to offset the income of predecessor corporations in conformity with Section 381. Section 381, in turn, forbids net operating loss carrybacks except in the case of an F reorganization—a mere change in identity, form or place of incorporation. In no other circumstance may a corporation having a distinct legal identity carry back its losses to offset the gains of another.

14. This Court concludes that the plan and agreement of merger entered into between the parties controls the characterization of the reorganization under federal income tax laws. That plan and agreement of merger provided first for a "B" reorganization—the exchange of the 28,900 shares outstanding of Spinoza of Texas for 395,000 shares of NHA's stock held by Spinoza of Delaware. Thus, the ownership of Spinoza of Texas was completely transferred from the Miller group to NHA, Inc., of which the Miller group then owned some 37.7% of its (NHA's) outstanding stock. This "B" reorganization was followed by an "A" reorganization—the statutory merger of Spinoza of Texas into Spinoza of Delaware following which Spinoza of Texas ceased its corporate existence under state law.

15. Spinoza of Delaware argues that it could have structured the transaction as a "B–F" reorganization—that is, have NHA swap its stock directly with Spinoza of Texas ("B" reorganization) and then reincorporate Spinoza of Texas under Delaware law ("F" reorganization). The simple answer to this argument is that a "B–F" reorganization was not the form chosen by the parties to the transaction. Plaintiff's argument is essentially directed at having this Court reform their transaction to gain them a tax advantage that they may have enjoyed had they structured the reorganization in another matter. While the Court, in scrutinizing a given transaction for tax purposes, may ignore sham and not "exalt artifice over reality", Gregory v. Helvering, 293 U.S. 465, 470, 55 S.Ct. 266, 79 L.Ed. 596 (1935), nevertheless, the parties to a transaction are bound by what they did. They cannot ignore the tax consequences of the form in which they chose to do business because at a later date they found that form to be disadvantageous. While the taxing authorities have freedom to attack the form of a transaction when it constitutes an artifice, the taxpayer cannot change direction willy-nilly to avoid unfavorable tax consequences it did not originally anticipate. Kraker v. United States, 457 F.2d 511 (C.A. 5, 1972); Skarda v. Commissioner, 250 F.2d 429 (C.A. 10, 1957); Commissioner v. Danielson, 378 F.2d 771 (C.A. 3, 1967); and Harris v. Commissioner, 461 F.2d 554 (C.A. 5, 1972).

16. The second, and more substantive answer to plaintiff's argument, is that even had it structured the reorganization as a "B–F" reorganization, this Court would not examine each segment of the reorganization separately.

Rather, it would look at the complete transaction without separating it into various steps and ignoring one step while considering only the other. Van Zandt v. Commissioner, 341 F.2d 440 (C.A. 5, 1965); Commissioner v. Court Holding Company, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945). Thus, this Court (even if the transaction had been structured as a "B–F" reorganization) would not ignore the transfer of stock between Spinoza of Texas and NHA, Inc., and concentrate only upon the reincorporation of Spinoza of Texas under Delaware law. Rather, this Court would, in that case, examine the entire transaction whereby the stock ownership of Spinoza of Texas was transferred entirely to NHA, Inc.

17. In addition to this argument, taxpayer cites two cases as authority for its position—Davant v. Commissioner, 366 F.2d 874 (C.A. 5, 1966), cert. denied, 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460 (1967) and Reef Corporation v. Commissioner, 368 F.2d 125 (C.A. 5, 1966), cert. denied, 386 U.S. 1018, 87 S.Ct. 1371, 18 L.Ed.2d 454 (1967). Both of these cases involve the definition of an "F" reorganization in a different context than that presented here. In both of these cases, the taxpayer was attempting, through a liquidation and reincorporation of the corporate assets, to "bail out" earnings and profits at capital gains rates. This scheme anticipated being taxed at capital gains rates rather than at ordinary income rates if the earnings and profits had been distributed as dividends. The Government attacked both schemes as constituting a sham, and questioned whether the liquidation-reincorporations constituted a 368(a)(1)(D) reorganization or an "F" reorganization, which, in either instance, would result in taxability of the earnings and profits of the liquidating corporation at dividend rates.

18. In the Davant case, there was a straight liquidation of the corporation and reincorporation of its assets in another company owned by the same shareholders as the first company. Thus, there was no shift in proprietary ownership between the first corporation and the second corporation. Rather, the only substantive effect of the reorganization was to distribute the earnings and profits of the first corporation to its shareholders. In order to deny the preferential capital gain rates, the Court held the sale to be a sham and the reorganization to be under Section 368(a)(1)(D), but indicated in an additional portion of its opinion Section 368(a)(1)(F) would also apply. In either case, consideration received by shareholders of the first corporation was taxable at ordinary income rates to the extent of earnings and profits of both corporations—the result of piercing the form of a transaction at the Government's insistence that it constituted a sham.

19. The Reef case was more complicated. It involved a liquidation-reincorporation situation similar to Davant except that the transaction also contemplated the redemption of shares held by the 48% minority interest of the first corporation. The Fifth Circuit refused to consider this plan under its unique facts and circumstances as constituting a step transaction and held that it, like Davant, constituted an "F" reorganization because there was complete continuity in identity of ownership immediately prior to and after the liquidation-reincorporation.

20. The most recent view of the "F" reorganization by the Fifth Circuit was Home Construction Corporation of America v. United States, 439 F.2d 1165 (1971). This case involved a carryback situation as does the present case, and the Court followed its earlier decision in Davant explaining and expanding it. According to the rules enumerated by the Fifth Circuit, there are three prerequisites for an "F" reorganization in order to qualify as a mere change in form, identity or place of incorporation. These are: Identity of shareholders and their proprietary interest; unimpaired continuity of the essential business enterprise; and a new form which is the

alter ego of the old. All three of these indicia are essential prerequisites to a framing of an "F" reorganization. Absence of any one of them is fatal to a claim of a reorganization under 368(a)(1)(F).

21. This Court concludes that the plaintiff here, Spinoza of Delaware, has not met any of the three requirements of Home Construction Corp. of America v. United States, 439 F.2d 1165 (C.A. 5, 1971). Spinoza of Delaware does not possess an identity of shareholders and their proprietary interests with Spinoza of Texas. Immediately prior to the Plan and Agreement of Merger, Spinoza of Texas was owned by the Miller group. Immediately afterwards, it was owned by NHA, Inc., of which the Miller group, in turn, owned stock amounting to 37.7% of the outstanding shares. Control was in the hands of NHA and not the Miller group.

22. The second prerequisite, unimpaired continuity of the essential business enterprise, has not been met by the plaintiff. This Court concludes that when NHA took away the engineering portion of Spinoza of Texas' business, it destroyed the unimpaired continuity of the business.

23. Finally, the last prerequisite, a new form which was the alter ego of the old, has not been met. Spinoza's closing of its tax year, adoption of a different method of accounting for long-term contracts and most important its status as a subsidiary of a publicly traded corporation rather than, as before, a private corporation controlling its own destiny, lead the Court to the conclusion that the Spinoza of Delaware form was not the alter ego of Spinoza of Texas.

24. The plaintiff cannot be considered to have undergone an F reorganization for three reasons:

(1) It adopted the form of a B–A reorganization and cannot attack the form which it voluntarily chose;

(2) the accounting treatment of Spinoza of Texas and Spinoza of Dela-

ware of the taxable years and method of accounting for long-term contracts strongly suggests that the parties to the transaction intended it to be a B–A reorganization rather than an F reorganization; and

(3) the substance of the transaction is that a massive change in the corporate structure including its method of doing business, ownership and form occurred on the date of the transaction, which change is inimicable to an F reorganization under the principles of *Home Construction.*

25. This Court finally concludes that it may not divorce the Plan and Agreement of Merger into two parts to attempt to avoid considering those changes in corporate structure as part of a so-called F reorganization. Rather, the Plan and Agreement of Merger is an integral document which must be considered as a whole. The statutory merger of Spinoza of Texas into Spinoza of Delaware may not be considered separately and apart from all of those changes in the corporation's structure and form occasioned by the Plan and Agreement of Merger. Accordingly, the plaintiff here is not entitled to carry back its net operating losses to offset the gains of its predecessor, Spinoza of Texas, and it shall take nothing by virtue of its claim.

## FINAL JUDGMENT

This cause came on for trial before the court without a jury. Having considered the record and being fully advised in the premises, it is

Ordered and adjudged that the findings of fact and conclusions of law entered in the above-styled case be and the same are hereby incorporated by reference. It is further

Ordered and adjudged that the plaintiff, Spinoza, Inc., take nothing, that the action be dismissed on the merits, and the defendant, United States of America, recover of the plaintiff, Spinoza, Inc., its costs of action.