The **AETNA CASUALTY AND SURETY COMPANY,** for itself and as successor by merger to the Aetna Casualty and Surety Company

v.

**UNITED STATES of America.**

**Civ. No. H–131.**

United States District Court,
D. Connecticut.

Oct. 15, 1975.

William G. Delana, J. Danford Anthony, Jr., Paul F. McAlenney, Hartford, Conn., for plaintiff.

Jerome Fink, and Robert M. Greco, Trial Attys., Tax Div., Dept. of Justice, Washington, D. C., Henry S. Cohn, Asst. U. S. Atty., Hartford, Conn., for defendant.

MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

This is a tax refund suit involving the complex reorganization provisions of the Internal Revenue Code. The plaintiff seeks over $4.4 million dollars, plus interest, which it claims to have overpaid in taxes. A review of the background of this case will make this claim more understandable. The parties have stipulated to most (and disagree as to none) of the material facts and have entered cross-motions for summary judgment.

## I.

Aetna Life Insurance Co. (Aetna Life) is a Connecticut company that writes and sells life, accident, and health insurance throughout this country and Canada. Until December 29, 1964, the Aetna Casualty and Surety Co. (Old Aetna) was a Connecticut company that wrote and sold liability, fire, theft, property damage, and surety insurance. Aetna Life had owned more than 50 per cent of Old Aetna's 7,000,000 shares of common voting stock continuously since 1958. By December 29, 1964, Aetna Life owned some 4,312,535 shares (61.61 per cent).

## A.

The Life Insurance Company Income Tax Act of 1959, Pub.L.No. 86–69, § 2(a), 73 Stat. 112, substantially changed the manner in which life insurance companies are taxed. For present purposes it is only important to understand that one of the effects of that Act was to make Aetna Life's taxes depend in part upon its asset base: the larger its assets, the greater its taxes. *See* Int.Rev. Code of 1954, §§ 802(a)(1), (b), 804(a) (1), 805(a)(1), (b)(2)(B), (b)(4). Among Aetna Life's assets was its ownership of 61.61 per cent of the stock of Old Aetna.

Aetna Life understandably wished to remove this interest in Old Aetna from its asset base. The obvious way to accomplish such a purpose was to distribute the assets to its shareholders.[1] In the context of insurance company taxation, however, such a route was problematical. The Int.Rev.Code of 1954, § 802 (b)(3) makes certain portions of "distributions to shareholders" taxable to the life insurance company. Because a distribution of Old Aetna stock apparently would have come within § 802

(b)(3), Aetna Life sought to have the law amended. In 1964 it succeeded. Act of Sept. 2, 1964, Pub.L.No. 88–571, § 4(a)(2), 78 Stat. 859, added, *inter alia*, the language that is now Int.Rev. Code of 1954, § 815(f)(3)(B). The language provided two avenues by which Aetna Life could distribute its Old Aetna holdings without tax consequences to itself; the routes were circuitous and narrowly defined:

"(f) Distribution defined.—For purposes of this section, the term 'distribution' includes any distribution in redemption of stock or in partial or complete liquidation of the corporation, but does not include—

. . . . . .

(3) any distribution after December 31, 1963, of the stock of a controlled corporation to which section 355 applies, if such controlled corporation is an insurance company subject to the tax imposed by section 831[2] and if—

. . . . . .

(B) control has been acquired after December 31, 1957—

(i) in a transaction qualifying as a reorganization under section 368 (a)(1)(B), if the distributing corporation has at all times since December 31, 1957, owned stock representing not less than 50 percent of the total combined voting power of all classes of stock entitled to vote, and not less than 50 percent of the value of all classes of stock, of the controlled corporation, or

(ii) solely in exchange for stock of the distributing corporation which stock is immediately exchanged by the controlled corporation in a transaction qualifying as a reorganization under section 368(a)(1)(A) or (C), if the controlled corporation

---

1. If a spin-off distribution is of stock of an 80 per cent "controlled" corporation, as defined in § 368(c), the receiving shareholders recognize no gain or loss from the transaction. *See* Int.Rev.Code of 1954, § 355(a)(1)(D) (ii).

2. Int.Rev.Code of 1954, § 831 provides rules for the taxation of insurance companies other than life insurance companies. Old Aetna was apparently such a company. So was an entity described below—New Aetna.

has at all times since its organization been wholly owned by the distributing corporation and the distributing corporation has at all times since December 31, 1957, owned stock representing not less than 50 percent of the total combined voting power of all classes of stock entitled to vote, and not less than 50 percent of the value of all classe of stock of the corporation the assets of which have been transferred to the controlled corporation in the section 368(a)(1)(A) or (C) reorganization."

In order to fit within this language,[3] Aetna Life proposed to organize the Farmington Valley Insurance Co. (Farmington Valley), a wholly owned shell subsidiary. Aetna Life would issue 13,300,000 shares of its voting common stock and exchange them for all 1000 shares of Farmington Valley. Then, pursuant to a reorganization plan approved in November 1964 by the shareholders of Farmington Valley and Old Aetna,[4] Farmington Valley would exchange its sole assets—the Aetna Life stock—for the voting common stock held by the Old Aetna shareholders in the ratio of 1.9 shares of Aetna Life stock for each share of Old Aetna stock. The Aetna Life stock received by Aetna Life in return for its 61.61 per cent holding in Old Aetna would be retired. The Old Aetna stock received by Farmington Valley, the surviving company,

would be cancelled. Farmington Valley would change its name to Aetna Casualty and Surety Co. (New Aetna) and, by operation of Connecticut's merger law, succeed to all of the assets and liabilities of Old Aetna. The management, business, and all of the attributes of Old Aetna would continue under the aegis of New Aetna. Aetna Life would then distribute the 1000 shares of New Aetna (formerly Farmington Valley) by putting them into a trust for the benefit of all of Aetna Life shareholders. Evidence of a proportional beneficial interest in the trust would be "stapled" to each Aetna Life share so that both the Aetna Life share and its proportionate beneficial interest in the trust of New Aetna shares would always be held by the same owner.

After having received approval from the Connecticut Insurance Commissioner and a ruling from the Internal Revenue Service (IRS) that the "acquisition by [Farmington Valley] of substantially all of the assets and assumption of the liabilities of [Old Aetna] in exchange solely for voting stock of Aetna Life will constitute a reorganization within the meaning of section 368(a)(1)(C) of the Code,"[5] the three companies carried out the plan described above on December 29, 1964. As the IRS found it to fit within the new exception to § 815, the nontaxability of the transaction desired by the parties came to pass.[6]

3. The parties disagree as to which subsection fits the transaction described below in the text. *Cf.* notes 16 and 17 *infra.* They agree, however, that the ultimate distribution fitted within one of these exceptions to the imposition of tax on certain distributions to shareholders.

4. The parties also agree that the procedures followed in the approval and execution of the plan conformed to those required by the 1964 versions of Conn.Gen.Stat.Ann. §§ 33–364 to 33–369. Thus the plan, when carried out, effected a merger under Connecticut law.

5. Ruling Letter from J. Littleton to A. DeWind, Oct. 23, 1964, at 5 (Exh. E to Stipulation of Facts).

6. Aetna Life used the complex procedure that it designed instead of simply making a tender offer to raise its interest in Old Aetna to 80 per cent, the "control" level. *See* Int.Rev.Code of 1954, § 368(c). This might have qualified as a reorganization under § 368(a)(1)(B), *cf.* B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 14.53, at 14–117 (3d abr. ed. 1971), and might have allowed distribution of Aetna Life's interest in Old Aetna to its shareholders without tax consequences to itself. *See* Int.Rev.Code of 1954, § 815(f)(3)(B)(i); *cf.* note 17 *infra.* If this route had been chosen and had succeeded the problem being litigated here, *see* pp. 503–504 *infra,* would never have arisen.

### B.

During 1964 Old Aetna and New Aetna incurred total net operating losses of $7,292,741. Of these, $7,253,144 were attributable, on a pro rata basis,[7] to Old Aetna; $39,597 of the losses were attributable to New Aetna.[8] During 1965 New Aetna incurred net operating losses of $11,594,322. Under Int.Rev.Code of 1954, § 172 operating losses of a taxpayer may be "carried back" to reduce its taxable income earned during the three preceding years.[9] The IRS allowed Old Aetna, apparently in its final return, to carry back its $7,253,144 share of 1964 losses to offset its 1961–62 and part of its 1963 taxable income. But it disallowed any carryback of New Aetna's 1964 and 1965 losses to offset the remainder of Old Aetna's 1963 income. The parties agree that if the carryback were allowed, New Aetna would be entitled to a refund of $4,071,655.21, plus the $395,975.38 of deficiency interest paid with respect thereto, plus legal interest on both such amounts.

The grounds of the IRS disallowance of the carryback are set forth in its technical advice memorandum of August 28, 1968 (Exh. J to Stipulation of Facts). The IRS relied on Int.Rev.Code of 1954, § 381, which is first concerned with "carryovers" in certain corporate acquisitions:

"(a) General rule.—In the case of the acquisition of assets of a corporation by another corporation—

(1) [This deals with the basis of assets distributed.]

(2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D) . . . or (F) of section 368(a)(1),

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c)."

Section 381 also deals specifically with "carrybacks" as follows:

"(b) Operating rules.—Except in the case of an acquisition in connection with a reorganization described in subparagraph (F) of section 368(a)(1)—

. . . . . .

(3) The corporation acquiring property in a distribution or transfer described in subsection (a) shall not be entitled to carry back a net operating loss for a taxable year ending after the date of distribution or transfer to a taxable year of the distributor or transferor corporation."

As it stated in its earlier ruling letter, the IRS contends that the transaction de-

---

The advantage to Aetna Life of the procedure actually used was its complete elimination of all minority interests in Old Aetna, a goal of importance to Aetna Life. Furthermore, dissenters would be able to receive only an appraised value of their stock. Conn.Gen. Stat.Ann. §§ 33–373 to 33–374 (1964).

7. That is, $364/366$ of the losses were attributed to Old Aetna; $2/366$ of the losses were attributed to New Aetna. This is because the transfer took place on December 29, 1964.

8. Int.Rev.Code of 1954, § 381(b)(1) provides that for certain corporate reorganizations in which what is acquired consists of assets the taxable year of the acquired corporation shall end on the date of the acquisition.

The IRS contends that the acquisition herein described is governed by this rule. Although the plaintiff acted as if this rule applied in 1964, it now contends that § 381(b)(1) is irrelevant to the transaction undertaken because no reorganization occurred, or the reorganization that took place is explicitly excepted from § 381(b)(1), or the reorganization did not involve an acquisition of assets.

9. Int.Rev.Code of 1954, § 832(c)(10) makes the deduction rules for "normal" taxpayers applicable to insurance companies other than life insurance companies, i. e., Old and New Aetna. For convenience I refer simply to § 172, although more precisely the authority for a loss carryback is § 832(c)(10) as it incorporates § 172.

scribed above was a C reorganization,[10] and that therefore § 381(b)(3) excludes New Aetna, the "corporation acquiring property in a . . . [C reorganization, as] described in subsection (a)," from carrying back "a net operating loss for a taxable year ending after the date of . . . [the reorganization] to a taxable year of" Old Aetna the transferor.

New Aetna, the plaintiff, makes several distinct arguments to support its position that the IRS is wrong and that it is indeed entitled to the carryback it seeks. These are described in the sections below.

To determine whether losses sustained by New Aetna after the merger may be carried back and offset against income earned by Old Aetna before the reorganization requires consideration of the special limitations of § 381, relating to "loss carrybacks," for, unlike the loss carryforwards permitted following all acquisition reorganizations, carrybacks of post-reorganization losses are permitted only in F reorganizations.

### II.

The plaintiff's broadest argument is that the transaction described above did not consist of a "reorganization" at all, but was nothing more than a "redemption" of the minority shareholders' interest in Old Aetna. If this be true, § 381's exclusion of a loss carryback does not apply to the plaintiff,[11] and the general loss carryback rule of § 172, *cf.* p. 503 *supra,* would entitle the plaintiff to its refund.

The plaintiff's argument is based on the decision by the Tax Court in *Casco Prods. Corp.,* 49 T.C. 32 (1967). *Casco Prods.* involved a very similar set of circumstances, varying materially from this case only in that (1) the companies involved were not in the insurance business and (2) the IRS had never been asked to rule that a reorganization had occurred. Casco, the surviving company in the merger there, sought to use the § 172 loss carryback rules, arguing that what had occurred was an F reorganization,[12] and was thus excepted from the § 381(b) exclusion from the benefits of § 172. *See* Int.Rev.Code of 1954, § 381 (b), *quoted* at p. 503 *supra.* The IRS denied that an F reorganization had occurred. The Tax Court "decline[d] the invitation to attempt to navigate [the] treacherous shoals" of defining the reach of § 368(a)(1)(F), 49 T.C. at 36, and instead took a different tack, deciding that the transaction was actually only a redemption of 9 per cent of the shares of Old Casco (the company comparable to Old Aetna here). Thus "the merger was a reorganization in form only and should consequently be ignored as such." *Id.,* at 37.[13]

---

10. Tax lawyer jargon refers to reorganizations by letter; the letter corresponds to the subsection of Int.Rev.Code of 1954, § 368(a)(1) which applies to the particular reorganization. For convenience and brevity I will adopt this shorthand method of notation herein.

Section 368 only *defines* transactions which are reorganizations. The tax consequences of reorganization exchanges and distributions is determined by separate provisions.

A C reorganization is "the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of substantially all of the properties of another corporation . . . ." · Int.Rev.Code of 1954, § 368(a)(1)(C).

11. The exclusion of § 381(b)(3) applies only to a "corporation acquiring property in a distribution or transfer described in subsection (a)." Section 381(a) describes, in relevant part, only transfers "in connection with a *reorganization*" (emphasis added).

12. "[A] mere change in identity, form, or place of organization, however effected." Int. Rev.Code of 1954, § 368(a)(1)(F).

13. The Tax Court considered possibly significant the fact that Standard Kollsman had actually attempted to acquire all of Old Casco's stock. *But cf. South Bay Corp. v. Commissioner,* 345 F.2d 698, 701–705 (2d Cir. 1965). Here Aetna Life did not first attempt to acquire all of Old Aetna's stock by tender offer or by having Old Aetna attempt to re-

Although the *Casco Prods.* analysis is intriguing, its reasoning is not persuasive. Here the transaction was more than a merely "formal" reorganization. One of Aetna Life's fundamental objectives was to remove the Old Aetna stock from its asset base in a tax-free transaction. In order to achieve this objective the transaction was specifically required to be a "reorganization" within the meaning of § 368(a)(1). *See* Int. Rev.Code of 1954, § 815(f)(3)(B), *quoted at* pp. 501–502 *supra*. Thus, the fact that this case involves the special problems of insurance company taxation materially distinguishes it from *Casco Prods.*

■■ *Casco Prods.* is the only case found by the parties or the court which has ignored in circumstances such as this what on its face is a reorganization. A distinction between it and the present case has already been noted. But, more fundamentally, I do not agree with the Tax Court's approach. Courts should look through form to substance when deference to the form of the transaction will defeat the purposes of the tax laws. It is not a policy that courts can use simply to duck hard cases. *See, e. g., United States v. General Geophysical Co.*, 296 F.2d 86, 87 (5th Cir. 1961), *cert. denied*, 369 U.S. 849, 82 S.Ct. 932, 8 L.Ed.2d 8 (1962):

> "The solution of hard tax cases requires something more than the easy generalization that the substance rather than the form of a transaction is determinative of its tax effect, since in numerous situations the form by which a transaction is effected does influence or control its tax consequences. . . ."

Giving effect to the form of the transaction here would not at all subvert the tax laws. Rather, not giving effect to the form would risk improper tax treatment in this case. The Aetnas sought and received an IRS ruling that their plan constituted a C reorganization.[14] As a result Aetna Life received a substantial, annually-recurring tax benefit.[15] Now (after the statute of limitations has long since run for the IRS to challenge the tax treatment accorded Aetna Life) New Aetna seeks to receive additional benefits on an inconsistent theory. In this circuit, such conduct does not by itself allow an estoppel to be worked against the taxpayer. *See Stair v. United States*, 516 F.2d 560 (2d Cir. 1975). *But cf.* 10 J. Mertens, *The Law of Federal Income Taxation* § 60.04 (rev. ed. 1970), and cases cited therein. But the possibility of such inconsistent positions points up the dangers of indiscriminately ignoring formalities in order to look "through" form to substance. I do not feel free to do that. In view of all these considerations, I decline to follow the Tax Court decision in *Casco Prods.* Since the plaintiff does not deny that the Aetnas' plan is described by a subsection of § 468(a)(1), there can be no doubt that

deem the minority shareholders' interests. In view of my rejection of the *Casco Prods.* analogy, explained below in the text, I do not decide whether this distinction would be material.

14. Indeed, plaintiff's counsel had specifically requested a ruling from the Treasury Department that "4. The merger of Aetna Casualty into New Corporation and the transfer of the Aetna Life stock held by New Corporation to the shareholders of Aetna Casualty on such merger *will constitute a reorganization within the meaning of section 368(a)(1)(C)*." *See* Ruling Request Letter from A. DeWind to B. Harding, Sept. 9, 1964, at 8 (Exh. C to Stipulation of Facts).

The response from the Treasury Department stated: "(4) The acquisition by New of substantially all of the assets and the assumption of liabilities of Aetna Casualty in exchange solely for voting stock of Aetna Life will *constitute a reorganization within the meaning of section 368(a)(1)(C) of the Code*."

15. The Plan of Reorganization sent to shareholders pointed out that Aetna Life's tax for the year 1963 would have been $2,700,000 less without the ownership of the Aetna Casualty shares and estimated the annual tax saving at $1,980,000. (Exh. H to Stipulation of Facts, at 7).

a reorganization occurred. However, the type of reorganization it was is also significant.

## III.

New Aetna's next argument is that the transaction undertaken constituted a B reorganization. Int.Rev.Code of 1954, § 368(a)(1)(B) provides that one form of reorganization is

> "the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition) . . . ."

In this case the acquiring corporation would be Farmington Valley (New Aetna); Aetna Life would be the corporation controlling the acquiring corporation; and Old Aetna would be the company acquired.[16]

According to New Aetna, a B reorganization escapes the loss carryback exclu-

sion of § 381(b)(3), thereby making the loss carryback allowance of § 172 applicable. The argument, which in general seems correct, is that the exclusionary language in § 381(b)(3) applies only to a "distribution or transfer described in subsection (a)." Subsection (a) of § 381 applies only to "the acquisition of the assets of a corporation by another corporation . . . in a transfer . . . in connection with a reorganization described in subparagraph (A), (C), (D), . . . or (F) of section 368(a)(1)." A B reorganization is not mentioned, and, as the plaintiff points out, Treas.Reg. § 1.381(a)–1(b)(3)(i) (1960) says that § 381 does not apply to transactions mentioned therein. Thus, if the transaction in this case was a B reorganization, the § 381(b)(3) exclusion would not bar the loss carryback sought by New Aetna.[17]

■ If Farmington Valley had simply acquired all of the stock of Old Aetna, there would be no question but that a B reorganization had occurred. In these circumstances Farmington Valley would continue to exist only as a holding company for Old Aetna, which would continue to be the operating entity. (And Old Aetna could carry back its 1965 loss-

16. The plaintiff claims that there is no inconsistency between this argument and the earlier IRS ruling that a C reorganization occurred. (New Aetna does not challenge the correctness of that ruling.) New Aetna's point is that a transaction may be described by two (or more) overlapping subsections of § 368(a)(1). In some contexts this point is unarguable. The authority cited by the plaintiff supports its position that a reorganization may qualify under subsection (F) of § 368(a)(1) and under some other subsection as well. *See, e. g.,* Rev.Rul. 57–276, 1957–1 Cum.Bull. 126; *Estate of Stauffer v. Commissioner,* 403 F.2d 611, 617 (9th Cir. 1968). And the statute itself recognizes that there may be overlaps between C and D reorganizations. *See* Int.Rev.Code of 1954, § 368(a)(2)(A). But there is no authority for making the proposition a universally applicable one, as the plaintiff would do. The descriptions of the transactions covered by subsections (B) and (C) might well be mutually exclusive.

Whether subsections (B) and (C) are necessarily inconsistent makes a difference in this case. As explained immediately below in the text, it is New Aetna's position that B reorganizations are exempt from the loss carryback exclusion of § 381(b)(3); C reorganizations are clearly covered by the exclusion. If the two types of reorganizations are inconsistent, then determining which type is involved in the transaction in question disposes of the loss carryback issue.

17. *Cf.* note 16 *supra.*
Perhaps Aetna Life could have achieved the first step of its tax goal (removing its interest in Old Aetna from its asset base in a tax-free transaction) by use of a B reorganization to acquire all of Old Aetna shares and then distribute them to a trust. However, by adopting the merger route Aetna Life was able to freeze out the outside shareholders of Old Aetna in a manner that it could not have done in a B acquisition. But obtaining that advantage carried certain limitations with it, as will be seen later.

es to offset its 1963 taxable income.) The complicating factor in this case is the statutory merger of the two companies in which Old Aetna disappeared and Farmington Valley survived (as New Aetna).[18] The question, then, is whether a stock-for-stock triangular reorganization (where the acquiring company, a shell subsidiary created specially for purposes of the transaction, exchanges its parent's stock for stock of the acquired company § 368(a)(2)(D)) in which the acquired company is merged into the acquiring company (subsidiary merger) qualifies as a B reorganization.[19]

The plaintiff's argument is based entirely on an analogy which it urges me to adopt. In several revenue rulings the problem has been posed whether a stock-for-stock triangular reorganization qualifies as a B reorganization. The IRS has held that such transactions may constitute B reorganizations. *See* Rev.Rul. 74–565, 1974 Int.Rev.Bull. No. 47, at 8; Rev.Rul. 74–564, 1974 Int.Rev.Bull. No. 47, at 7; Rev.Rul. 67–448, 1967–2 Cum. Bull. 144. The sole distinction between the cases there ruled upon and the problem presented here is that in those cases the acquired company survived the acquisition process; here Old Aetna did not. Under Connecticut law all assets of the merged corporation (Old Aetna) became assets of the surviving corporation (New Aetna) without any further act or deed. Conn.Gen.Stat.Ann. § 33–369(c).

■■■ It is *often difficult to construe tax statutes in a coherent and rational*

way. But it was not incongruent for the draftsmen to omit B reorganizations from § 381. A reasonably consistent underlying theory is discernible. The common element among the transactions covered by the § 381(b)(3) loss carryback exclusion is that the company incurring the losses is a different entity from the company to which the losses would be carried back. This is a basic distinction and not surprising, for the § 172 carryback provision assumes only a single taxpayer. A taxpayer corporation cannot normally "assign" its loss carryback to some other company. *See New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440–442, 54 S.Ct. 788, 78 L.Ed. 1348 (1934). The significance of this is bolstered by the fact that the common element among those reorganizing transactions not falling within the loss carryback exclusion is that the same entity that incurs the losses earned the income against which they will be offset. *Cf. Estate of Stauffer v. Commissioner*, 403 F.2d 611, 622 (9th Cir. 1968). Where there has simply been a "recapitalization," *see* Int. Rev.Code of 1954, § 368(a)(1)(E), the same corporate entity remains. *See* B. Bittker & J. Eustice, *supra* note 6, ¶ 14.17, at 14–59. Where there has been a B reorganization not involving a merger two corporations remain, and each may carry back its losses to offset its own earlier income. Where there has been a B reorganization and a merger in which the acquiring company (a shell) is merged into the acquired company, the operating company survives and can carry its later losses back to offset its own

---

18. One form of reorganization, an A reorganization, is defined as "a statutory merger or consolidation." Int.Rev.Code of 1954, § 368(a)(1)(A). For purposes of the loss carryback rules, such reorganizations are treated the same as C reorganizations, *i. e.*, no loss carryback is permitted. *See* Int. Rev.Code of 1954, § 381(a)(2), (b)(3). The transaction here in issue, although involving a statutory merger, apparently did not qualify as an A reorganization because the stock exchanged for Old Aetna stock was not Farmington Valley stock but Aetna Life stock. *See* S.Rep.No.1653, 90th Cong., 2d Sess.

(1968), 1968–3 U.S.Code, Cong. & Admin. News, pp. 4440, 4441. It was not until 1968 that such a transaction would have qualified as an A reorganization. Act of Oct. 22, 1968, Pub.L.No.90–621, § 1(a), 82 Stat. 1310 (codified at Int.Rev.Code of 1954, § 368(a)(2)(D)). *Cf.* note 20 *infra*.

19. A C reorganization, as found to exist here, is a transaction involving two corporations dealing directly with each other at the corporate level; on the other hand, a B reorganization involves a transaction between an acquiring corporation and the individual shareholders of the target corporation.

**508**

earlier income. *Cf.* Rev.Rul. 67–448, 1967–2 Cum.Bull. 144.

■ The plaintiff argues that this is a distinction without a difference; the direction of the merger should not matter.[20] I cannot agree. Had the merger been in reverse, Old Aetna would have acquired either all of the assets of New Aetna (an asset sale) or all of the stock of New Aetna (a stock sale) and Aetna Life (or New Aetna) would have received an additional 61 per cent of newly issued voting stock of Old Aetna in the exchange. Aetna Life's ability to meet the requirements of § 815(f)(3)(B) would not have been improved at all.

■ Viewed against this background it is clear that the direction of the merger in this case did make a difference. Since it was the operating company, Old Aetna, that disappeared in the merger, the losses sought to be carried back to offset Old Aetna's income are those incurred by a different company. To allow this carryback, *i. e.*, to call the transaction undertaken in this case a B reorganization, would subvert the clear intent of the Code to disallow loss carrybacks across corporate lines.[21] In the absence of any compelling consideration mandating that this transaction be treated as a B reorganization, I cannot accept the plaintiff's argument and the violence

20. The plaintiff relies upon a statement in S. Rep.No.91–1533, 91st Cong., 2d Sess. (1970), 1970–3 U.S.Code, Cong. & Admin.News, pp. 6123, 6124, that "there is no reason why a merger in one direction . . . should be taxable, when the merger in the other direction . . . , under identical circumstances, is tax-free." In context, however, this statement is seen to be inapposite. As discussed in note 18 *supra*, in 1968 Congress amended the tax laws to allow transactions to be treated as A reorganizations where the acquiring company exchange its parent's stock instead of its own for properties of the acquired company (which disappeared in the merger). But where there was a reverse merger—the acquiring company being merged into the acquired—and the acquiring company used its parent's stock, treatment as an A reorganization remained barred. In 1971 Congress accorded such reverse mergers the same treatment as it accorded mergers in the other direction in 1968. Act of Jan. 12, 1971, Pub.L.No.91–693, § 1(a), 84 Stat. 2077 (codified at Int.Rev.Code of 1954, § 368(a)(2)(E)). It was in the course of the Senate report on this Act that the statement quoted by the plaintiff appears.

The question considered by the Senate report, then, was whether the use of a parent's stock should make a transaction taxable or not depending upon the direction of the merger. (It is clear that where a parent's stock is not involved, a merger in either direction can qualify as an A reorganization.) In the present case, however, the taxability of the transaction is not at issue. If the merger in a case like the present one is such that the acquiring company disappears, the transaction is now nontaxable either as an A reorganization, *see* Int.Rev.Code of 1954, § 368(a)(2)(E), or, if it does not qualify thereunder, as a B reorganization, *see, e. g.*, Rev.Rul. 74–565, 1974 Int.Rev.Bull. No. 47, at 8. If the merger, as here, is such that the target company disappears, the transaction is now nontaxable as an A reorganization, *see* Int.Rev.Code of 1954, § 368(a)(2)(D), or, if it does not qualify thereunder and if the IRS continues to rule as it did in the case of the Aetnas, it is nontaxable as a C reorganization. *Cf.* Rev.Rule. 67–448, 1967–2 Cum.Bull. 144, 145. The question in the present case, then, is whether such a transaction should be not only nontaxable but also exempt from the loss carryback exclusion of § 381(b)(3) as a B reorganization. The issue of exemption from the loss carryback exclusion was not involved in the problem considered by the Senate report quoted by the plaintiff, and, as seen below in the text, the direction of the merger might well be relevant to this issue although irrelevant to the issue of the taxability of the transaction. *See generally*, Rachofsky, *The Reorganization That Fails: Tax Consequences of an Involuntarily Taxable Reorganization*, N.Y.U. 32d Inst. on Fed.Tax, Pt. 1, 639, 640–663 (1974).

21. In both this case and the case described by Rev.Rul. 67–448, 1967–2 Cum.Bull. 144, one of the two merged companies has been a shell subsidiary created solely for purposes of the transaction. A third possible case would involve an operating subsidiary merging with an operating company. The analysis above is not intended to intimate any views as to the proper tax treatment of such a transaction.

that it would do to the structure and purpose of the Code.[21A]

### IV.

Another argument raised by New Aetna is that the transaction which occurred amounted to an F reorganization—"a mere change in identity, form, or place of organization, however effected." Int.Rev.Code of 1954, § 368(a)(1)(F).[22] If this be true, the transaction is expressly excepted from the § 381(b)(3) exclusion from the loss carryback benefits of § 172. See Int.Rev.Code of 1954, § 381(b), *quoted at* p. 503 *supra*.[23]

In considering whether there was an F reorganization here it should be noted that it is not irrational for an F reorganization to also meet the requirements of (A), (C) or (D) of § 368(a)(1). The Commissioner has so ruled in Rev.Rul. 57–270, 1957 Cum.Bull. 126. *See also Estate of Stauffer v. Commissioner,* 9 Cir., 403 F.2d 611, 617 n. 7.

The case law has established a number of requirements for qualification as an F reorganization. The IRS raises no challenge to the Aetnas' compliance with most of them. The sole requirement that the IRS contends is unmet in the circumstances of this case is that there be no significant [24] shift in proprietary interest between Old and New Aetna as a result of the reorganization. *See, e. g., Hyman H. Berghash,* 43 T.C. 743, 752 (1965), *aff'd,* 361 F.2d 257 (2d Cir. 1966). The thrust of the government's argument (leaving aside for the moment some of its technicalities) is as follows: before the reorganization, Aetna Life owned 61.61 per cent of Old Aetna; after the reorganization, the proprietary interest had shifted so that Aetna Life owned 100 per cent. Such a shift, the government contends, precludes finding that "a mere change in identity, form, or place of organization" has taken place.

### A.

The plaintiff has two responses to this position. The first is that the transaction undertaken is separable into two parts. In the first part, the argument runs, the interests of the minority shareholders were "redeemed"; in the second part (after the "redemption"), there was a reorganization between Old and New Aetna in which there was an absolute

---

[21A]. Whether the 61.61 per cent of Old Aetna held by Aetna Life had been acquired solely in exchange for voting stock has not been established. *Cf. Helvering v. Southwest Consol. Corp.,* 315 U.S. 194, 198, 62 S.Ct. 546, 86 L.Ed. 482 (1942). Therefore, I do not reach the question of whether the use of a shell corporation as a conduit insulates against compliance with the requirements of § 368(a)(2)(B) that 80 per cent control must be acquired solely in exchange for voting stock or in unrelated transactions.

22. The plaintiff notes that the IRS has designated the scope of subsection (F) of § 368(a)(1) a "prime issue" for litigation and resolution. IRS Manual (MT 1277–8, Nov. 19, 1974).

23. *See* note 16 *supra.* And Treas.Reg. § 1.-381(b)–1(a)(2)(1960) provides in part:

"In the case of a reorganization qualifying under section 368(a)(1)(F) (whether or not such reorganization also qualifies under any other provision of section 368 (a)(1)), the acquiring corporation shall be treated (for purposes of section 381) just as the transferor corporation would have been treated if there had been no reorganization. . . ."

The parties have stipulated that if there had been no reorganization, Old Aetna would have been entitled to the loss carryback New Aetna seeks here. Stipulation of Facts ¶ 38.

24. Even under the government's view there may be incidental or de minimis shifts in proprietary interests. *See* Rev.Rul. 74–36, 1974 Int.Rev.Bull. No. 4, at 7; Rev.Rul. 66–284, 1966–2 Cum.Bull. 115; Comment, *(F) Reorganizations and Proposed Alternate Routes for Post-Reorganization Net Operating Loss Carrybacks,* 66 Mich.L.Rev. 498, 498–499 n. 5 (1968). The difference between the parties is that the IRS would read these precedents as limited to situations such as presented in the revenue rulings cited above—a clean-up of fractional shares; appraisal and satisfaction of the interests of shareholders owning less than one per cent of the total shares who dissented from the decision to reincorporate in another state. Although the plaintiff would read the requirement to be that there can be no economically significant shifts in proprietary interest, it claims that none have occurred here.

identity of proprietary interests before and after the transaction (*i. e.*, at both times Aetna Life owned all of Old and New Aetna). New Aetna contends that the second part should therefore be held to be an F reorganization.

The plaintiff's first response is drawn mainly from *Reef Corp. v. Commissioner,* 368 F.2d 125 (5th Cir. 1966), *cert. denied,* 386 U.S. 1018, 87 S.Ct. 1371, 18 L. Ed.2d 454 (1967). It is sufficient for purposes here to state the facts as distilled by the court in *Reef* at 134:

> "First, the holders of 48% of the stock in Reef Fields had their stockholdings completely redeemed. Second, new Reef was formed and the [remaining] assets of Reef Fields were transferred to new Reef [now wholly owned by the former owners of the other 52% of stock in Reef]."

The court held that the redemption of the stock of the shareholders owning 48 per cent was "functionally unrelated" to the liquidation and reincorporation into new Reef. On that analysis the court held there was an F reorganization, since there was 100 per cent identity of ownership between the transferor and transferee and only one operating corporation was involved (the newly created shell). In addition the court found inapplicable because of the "complete revision of the Code in 1954," 368 F.2d at 134, 137, the holding of the Supreme Court that the predecessor of § 368(a)(1)(F) did not apply where there was a shift in proprietary interest. *See Helvering v. Southwest Consol. Corp.,* 315 U.S. 194, 202–203, 62 S.Ct. 546, 86 L.Ed. 482 (1942). Since the court found the redemption aspect of the *Reef* transaction [24A] irrelevant, it concluded that "[t]he only characteristics of a corporate reorganization [present in this case] are the changes in name and state of incorporation. Those are primarily the characteristics of an (F) . . . reorganization. . . ." 368 F.2d at 136.

Invoking the step-transaction doctrine to ignore the shift in proprietary interest which excluded the 48 per cent group in order to treat the rest of the transaction as an F reorganization may be a tenable view, but I do not share it. Neither did Circuit Judge Griffen B. Bell whose sole difference in dissent (he also wrote the majority opinion for the court) was to this ruling. 368 F.2d at 138.

■ I am of the opinion that the elimination of Old Aetna's minority shareholders should not be ignored.

[First, there seems to be no support for the proposition that the 1954 Code revisions implicitly overruled *Helvering v. Southwest Consol. Corp.,* 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 482 (1942). *See United States v. American Inst. of Mkt'g Sys., Inc.,* 345 F.Supp. 610, 612 (E.D.Mo.1972); *cf. Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 152, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974) (citation to *Southwest Consol. Corp.*'s analysis of a different reorganization provision); Comment, *Section 368(a)(1)(F) and Loss Carrybacks in Corporate Reorganizations,* 117 U.Pa.L.Rev. 764, 767–772 (1969).]

*Southwest Consol. Corp.* would not have been controlling precedent if there had been a change in the statute. *Cf. Maxwell Hardware Co. v. Commissioner,* 343 F.2d 713, 716 (9th Cir. 1965). However, that was not the case with § 368 (a)(1)(F).

There is as little guidance from the regulations on F reorganizations as there are cases on point. However, the legislative history of the § 368(b) exemption of F reorganizations from the exclusion of loss carryback benefits is illuminating:

> "Generally, section 381 was designed to permit certain reorganized corporations to inherit some tax attributes of their predecesssors. When section

**24A.** Unlike Reef, where its assets were paid out to minority shareholders in redemption of their shares, 368 F.2d at 128, no assets of Old Aetna were used to redeem the shares of its minority shareholders.

381 was first introduced, the House version contained no reference to (F) and indeed did not allow carrybacks in any transaction covered by section 381.[47] During the Senate hearings on section 381, a plea was made for the inclusion of a carryback provision which would operate when a corporation had merely changed its identity, form, or place of organization.[48] This plea, which eventually resulted in the appearance of (F) together with a limited carryback provision in section 381(b), was precipitated by the case of a New York corporation. Having operated profitably for years, this corporation reincorporated in New Jersey, changing only its place of organization, and thereafter suffered a financial setback which eliminated its working capital. The corporation was thrown into bankruptcy when the IRS ruled that since the New Jersey corporation was not the same as the New York corporation, the loss could not be carried back to pre-reorganization years. In the Senate hearings, the proponents of a carryback pointed out that had a carryback been available, the New Jersey corporation could have replenished its working capital by means of a tax refund on prior tax years."

47. *See* H.R.Rep.No.1337, 83d Cong., 2d Sess. A135 (1954). In the Senate, March 23 (legislative day March 1), 1954.

48. *See Hearings on H.R. 8300 Before the Senate Comm. on Finance*, 83d Cong., 2d Sess. pt. 3, 1531–70 (Report on H.R. 8300 by Section on Taxation— New York State Bar Association, Albany, N.Y.) (1954).

Comment, *supra* note 24, at 506–507 (certain footnotes omitted).

If the plea which led to the inclusion of an F type of reorganization in § 381

exemplifies the rationale for exempting it from an exclusion against loss carrybacks, it seems clear that Congress intended carrybacks to be allowed across reorganization lines only where changes of merely formal consequences had occurred.[25] Insofar as rules can be stated, the language defining an F reorganization seems adequate. The intent of Congress seems entirely consistent with the Supreme Court's analysis that where there are shifts in proprietary interests a transaction can "hardly" be an F reorganization. *See Helvering v. Southwest Consol. Corp.*, 315 U.S. 194, 202–203, 62 S.Ct. 546, 86 L.Ed. 482 (1942). Since an F reorganization is limited by the terms of the statute to effecting only a boundaried range of corporate changes, it would seem more likely that all of the changes actually effected should be examined to determine whether the limits of § 368(a)(1)(F) had been exceeded.

[Second, there is some indication that the Second Circuit rejects this portion of the *Reef* analysis. In *Commissioner v. Berghash*, 361 F.2d 257, 259–260 (2d Cir. 1966), the court upheld without substantial discussion a Tax Court decision refusing to find an F reorganization where a drug store owner, in a transaction similar to that in *Reef*, redeemed half of his interest in his company and allowed another to buy in to the extent of a 50 per cent share. The Tax Court had relied on *Helvering v. Southwest Consol. Corp.*, 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 482 (1942), and *Joseph C. Gallagher*, 39 T.C. 144 (1962), *inter alia*, in finding that a significant shift in proprietary interest precluded treatment as an F reorganization. It does not follow that because a "redemption is not a characteristic of a reorganization," *Reef*, 368 F.2d at 136, it cannot effect a change in proprietary interest. *See Hyman H. Berghash*, 43 T.C. 743, 752–754 (1965), *aff'd*, 361 F.2d

25. *See* Comment, *supra* note 24, at 510 & n. 64; Comment, *Section 368(a)(1)(F) and Loss Carrybacks in Corporate Reorganizations*, 117 U.Pa.L.Rev. 764, 776 (1969);

Tiger, *Subsidiary Mergers and (F) Reorganizations*, N.Y.U. 28th Inst. on Fed.Tax. 231, 264 (1970).

257 (2d Cir. 1966).[26] From this affirmance of *Berghash* the Tax Court has concluded that the Second Circuit does not accept that portion of *Reef* which rejected post-1954 reliance on *Southwest Consol. Corp. See Estate of Henry P. Lammerts,* 54 T.C. 420, 436 (1970), *aff'd in part and remanded,* 456 F.2d 681 (2d Cir. 1972). I believe that this is a salutary conclusion and follow it here.]

The other basis of New Aetna's theory of separable transactions is Rev.Rul. 61–156, 1961–2 Cum.Bull. 62. In the transaction there considered, a corporation (X) adopted a plan of complete liquidation then sold all its assets to a new corporation (Y) formed by the management of X. The purchasing corporation paid X 45 per cent of its stock plus notes and cash; these considerations were distributed to X's shareholders pursuant to the plan of liquidation. Y continued X's business without interruption and sold the remaining 55 per cent of its stock through a public offering. Y and the shareholders of X sought to have these transactions limited to a sale of corporate assets followed by a complete liquidation.

Because this characterization of the transaction would result in minimal tax proceeds, the IRS sought to rule that the X–Y transaction was an F reorganization followed by an unrelated distribution of dividends. In the particular circumstances presented by the X–Y transaction, however, there was an apparent obstacle to finding an F reorganization: the plan included a 55 per cent shift in proprietary interest by virtue of the public issue of Y stock. The IRS solved the problem much as did the Fifth Circuit in *Reef:*

"The issuance of stock to new investors can be disregarded as being a separate transaction, since even with-

out it the dominant purpose—to withdraw corporate earnings while continuing the equity interest in substantial part in a business enterprise conducted in corporate form—was fully achieved. The issuance of stock to new investors was not needed to implement the dominant purpose and, therefore, the rest of the transaction was not fruitless without it and so dependent on it."

1961–2 Cum.Bull. at 63.

Perhaps the key to understanding both *Reef* and Rev.Rul. 61–156 is to realize that they were both efforts to frustrate the "liquidation-reincorporation" stratagems with which the court and the IRS were faced. Such tax avoidance plans subvert the tax laws and have created serious problems; courts and the IRS have been willing to hang decisions rejecting such stratagems in an acrobatic fashion upon any sections of the Code that seem convenient. *See generally* B. Bittker & Eustice, *supra* note 6, ¶ 14.-54. Such rulings may solve the immediate problem, but they are quite likely to establish law that will complicate other cases. *See, e. g.,* Comment, *supra* note 25, at 779–780. The attempt to reconcile positions taken by the Commissioner or the Tax Court where tax consequences of a different kind were at stake is unrewarding, and the precedent value of those cases here is slight. However, the Ninth Circuit, for one, has shown itself willing to accept these consequences:

"We do not see how the definitive principles of an 'F' reorganization can change from one case to another, from one context to another, dependent upon which position the Commissioner of Internal Revenue prefers. While the factual situation which gives rise to a determination in a given case will invariably differ, the standards by

---

26. It might be argued that *Berghash* does not undermine *Reef* because in the Second Circuit case a 50 per cent interest was transferred and a new owner entered. However, in *Berghash* the Second Circuit specifically approved the Tax Court's use of *Gallagher,* 361 F.2d at 260. In *Gallagher* the extent of the shift in proprietary interest was well below 50 per cent.

which the determination is to be made cannot. An 'F' reorganization is just that, and tax consequences flow from that determination, not vice versa." *Estate of Stauffer v. Commissioner*, 403 F.2d 611, 619 (9th Cir. 1968). I am not so sanguine about adopting the ramifications of principles such as those established in *Stauffer, Reef*, and Rev. Rul. 61–156.[27] Such principles strain to isolate each element of a transaction (using the "step-transaction" doctrine), whereas the normal rule is to view each transaction as a whole composed of interrelated steps. *See, e. g., Spinoza, Inc. v. United States*, 375 F. Supp. 439, 443–444 (S.D.Tex.1974).

▄ In the case at bar there is no tax avoidance scheme to be rejected. Indeed, the Aetnas' transaction was a means to an end structured as it was for the purpose of complying with § 815(f) (3)(B). *See* B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 14.51, at 14–102 (3d abr. ed. 1971); Mintz & Plumb, *Step Transactions in Corporate Reorganizations*, N.Y.U. 12th Inst. on Fed. Tax. 247, 252–253 (1954). Each separate step had no value for its own sake. Thus I decline to apply the step-transaction logic of *Reef* and Rev.Rul. 61–156 to the distinguishable problem presented here. Instead, I turn to the question whether the ouster of the Old Aetna minority shareholders precludes this transaction, considered as a whole, from being an F reorganization.

### B.

▄ In *Helvering v. Southwest Consol. Corp.*, 315 U.S. 194, 202–203, 62 S.Ct. 546, 552, 86 L.Ed. 482 (1942),

the Supreme Court said: "a transaction which shifts the ownership of the proprietary interest in a corporation is hardly 'a mere change in identity, form, or place of organization' . . . ." Courts have generally applied the *Southwest Consol. Corp.* standard to decide whether characterization as an F reorganization was appropriate in many subsequent cases with reorganizations involving the entrance of new shareholders. *See e. g., Hyman H. Berghash*, 43 T.C. 743 (1965), *aff'd* 361 F.2d 257 (2d Cir. 1966). But in this case there has not been an influx of new shareholders, only an ouster of old ones. The plaintiff contends that this distinction is significant enough to make analogies to post-*Southwest Consol. Corp.* cases in which new shareholders have been introduced inapt. Of course, the fact that no new shareholders entered in this case should not, without more, guarantee characterization as an F reorganization. And neither should it make inapplicable the analysis in *Southwest Consol. Corp.* itself. The language of the Court is broad enough to exclude an F where there are shifts in degree of ownership *vel non*, and the Court did not evidence any intent to qualify it.

There is a basic distinction between the view of the Supreme Court and that stated by the court in *Reef*, 368 F.2d at 136: "Where there is no substantial change in the corporate operation, (F) should be applied. . . ." There is a difference between continuity in the operation of a business and continuity of interest in that business. The Supreme Court emphasized that there were more than formal changes, not operational continuity. The difference is concep-

---

27. *See also Davant v. Commissioner*, 366 F.2d 874 (5th Cir. 1966), *cert. denied*, 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460 (1967).

The use of § 368(a)(1)(F) was one of the IRS' prime weapons against the "liquidation-reincorporation" problem exemplified by the X–Y transaction in Rev.Rul. 61–156 during the early 1960's. *See, e. g., Davant v. Commissioner, id.*; Comment, *supra* note 24, at 503–504 n. 34; Comment, *supra* note

25, at 772–776. The Commissioner has announced that *Stauffer* will not be followed. Rev.Rul. 69–185, 1969–1 Cum.Bull. 108.

An excellent discussion of the F reorganization and the *Stauffer, Reef*, and *Davant* cases is found in Pugh, *The F Reorganization: Reveille for a Sleeping Giant*, 24 Tax L.Rev. 437 (1969); *see also* Tiger, *Subsidiary Mergers and (F) Reorganizations*, N.Y.U. 28th Inst. on Fed.Tax. 231, 263 (1970).

tual. A "mere change in identity, form, or place of organization" has no reference to any of the economic realities upon which taxes are based. It is a plausible view that unless the changes in the taxpayer corporation are of more than de minimis economic reality, it ought to be allowed to *carry back* losses to a prior year. It is not enough to say that the carryback of losses (and recapture of proper taxes previously paid) "should be allowed because for all practical purposes the new corporation was the same entity as the old one and . . . the same taxpayer." *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 441, 54 S.Ct. 788, 791, 78 L.Ed. 1348 (1934).

The issue here is to what extent the Supreme Court's language in *Southwest Consol. Corp.* precludes shifts of interest among shareholders in an F reorganization. There have been no cases which have attempted to answer this question in a squarely analogous situation. New Aetna cites several cases, but none provide any substantial aid in resolving the question presented here.[28] In *Gordon v. Commissioner*, 424 F.2d 378 (2d Cir.), *cert. denied*, 400 U.S. 848, 91 S.Ct. 63, 27 L.Ed.2d 86 (1970), the court observed at 384:

"Although a number of cases have pointed to a complete identity of shareholders before and after the transaction as evidence that the corporation had undergone a mere change in form, see, e. g., *Associated Machine v. Commissioner of Internal Revenue*, 403 F.2d 622, 625 (9 Cir. 1968); *Estate of Stauffer v. Commissioner of Internal Revenue*, 403 F.2d 611, 618 (9 Cir. 1968); *Davant v. Commissioner of Internal Revenue*, 366 F.2d 874, 884 (5 Cir. 1966), cert. denied, 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460 (1967), it is not clear thus far whether such an identity is an indispensable condition to the invocation of Section 368(a)(1)(F)."

In determining whether the changes effected by a transaction are so insubstantial as to fall within the exception to § 381(b)(3), Congress had directed that the economic realities, not mere forms of reorganization, must control. *See* H.R.Rep.No.1337, 83d Cong., 2d Sess. (1954), 1954–3 U.S.Code, Cong. & Admin.News, pp. 4025, 4066–4067; S. Rep. 1622, 83d Cong., 2d Sess. (1954), 1954–3 U.S.Code, Cong. & Admin.News, pp. 4629, 4683–4684; Comment, *supra* note 24, at 513. In this case the economic realities seem quite plain. The minority shareholders were eliminated and Aetna Life, which previously had owned only 61.61 per cent of Old Aetna, became the sole owner of its successor, New Aetna.[29] Ultimately, it is the

28. *San Joaquin Fruit & Investment Co.*, 28 B.T.A. 395 (1933), *rev'd on other grounds*, 77 F.2d 723 (9th Cir. 1935), *rev'd*, 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed. 824 (1936), was decided in the Tax Court nine years before the applicable rule was announced in *Southwest Consol. Corp. Nutil v. United States*, 23 Am.Fed. Tax R.2d 69–486 (C.D.Cal. Sept. 16, 1968), and *Breech v. United States*, 23 Am.Fed. Tax R.2d 69–489 (C.D.Cal. Sept. 19, 1968), *aff'd on unrelated ground*, 439 F.2d 409 (9th Cir. 1971), were in relevant part related refund suits by shareholders of the same company. The transaction there at issue had several features that distinguish it from the transaction at bar: it was a liquidation-reincorporation scheme in which new shareholders entered and, as here, the relative interests of the old shareholders shifted. The court, without discussion of *Southwest Consol. Corp.* or the effect of the shift in relative interests, found both a D and an F reor-

ganization. The opinions of the court make it clear that its holding was predicated on a desire to avoid giving effect to the plaintiffs' "contrivance to bail out corporate earnings at capital gains tax rates." *Nutil v. United States*, 23 Am.Fed.Tax R.2d 69–486, 69–489 (C.D.Cal. Sept. 16, 1968). However, the court found no legitimate business purpose for the transaction there undertaken, and such a purpose is normally a prerequisite to characterization as a reorganization. *See, e. g., Helvering v. Gregory*, 69 F.2d 809 (2d Cir. 1934), *aff'd*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Treas.Reg. § 1.368–1 (b) to –1(c) (1955). Thus these decisions are distinguishable from this case. To the extent that they are not, I decline to follow them.

29. The parties have devoted a great deal of space to arguing how this change should be measured. By virtue of the stapled trust pre-merger Aetna Life shareholders received

shareholders of a corporation who own it, and a basic distinction must be made between that ownership interest in the corporation and "a mere change in identity, form, or place of organization" which will satisfy an F corporate reorganization. In this case the shift in interests resulted in one group of shareholders (38.39 per cent) being ousted. The plaintiff argues that their involvement continued by virtue of their receipt of shares in Aetna Life, which became the owner of New Aetna. This fact should not be singled out as controlling. The Supreme Court spoke of "shifts" in proprietary interests, and there is no reason to believe that a complete ouster should not be viewed as a significant shift. Through the merger the minority shareholders of Aetna Casualty obtained 5,106,187 shares of Aetna Life. Non-exchanging Aetna Life shareholders held 20,000,000 shares. (Exh. H to Stipulation of Facts, at 6). Giving effect to the stapled trust the equity of a share in Aetna Life increased from $54.07 before the merger to $65.95 after it; Aetna Casualty stock equity went from $48.76 to $50.12. Comment, *supra* note 25, at 779; Exh. H to Stipulation of Facts, at 11. Practical changes in the control of the business resulted from the reorganization. These realities cannot be ignored; there has been a substantial change in the proprietary interests of the Aetna Casualty and Surety Co. shareholders.[30] The scope of that change is beyond that which Congress had in mind in enacting the F exemp-

tion from the carryback exclusion of § 381(b)(3). In view of all these factors, it cannot be said that the Aetnas' transaction falls within the definition of an F as "a mere change in identity, form, or place of organization."[31]

### V.

Because the Aetnas' transaction was a reorganization, but not a B or an F reorganization, within the meaning of § 368(a)(1), § 381(b)(3) prohibits New Aetna from offsetting its 1964 and 1965 losses against Old Aetna's 1963 income. Therefore, New Aetna's motion for summary judgment is denied; the government's motion for summary judgment is granted. It is

So ordered.

approximately 80 per cent of the beneficial interest in New Aetna, and former Aetna Casualty shareholders holding 38.39 per cent of its shares received a beneficial interest of only about 20 percent—a dilution of more than 40 per cent. On New Aetna's method of calculation it is possible to conclude that there has been only an 8.98 per cent shift in proprietary interest. This is a debate that I decline to enter: the economic reality of the change in proprietary interest, however measured, is sufficient to control the tax significance of the transaction. There is no logical basis for holding that because 80 per cent control is needed to qualify for non-tax-

ability of an exchange (§ 368(c)) any change in proprietary interest of less than 20 per cent is de minimis for an F.

30. When the bank trustee selected by Aetna Life became the legal owner of all of the shares of New Aetna, the former shareholders of Old Aetna were merely *cestuis que trustent* for whose benefit the shares were held. Thus not only was their interest proportionately reduced, the nature of it changed to less than full ownership.

31. Cf. Comment, *supra* note 25, at 779.